Martha P. VOGT, Plaintiff,

v.

Shirley S. CHATER, Commissioner
of Social Security, Defendant.

No. 96–4060–SAC.

United States District Court,
D. Kansas.

Feb. 27, 1997.

Ross E. Stubblefield, Kansas Legal Services, Inc., Topeka, KS, for Martha P. Vogt.

Jackie A. Rapstine, Office of U.S. Attorney, Topeka, KS, for Shirley S. Chater.

MEMORANDUM AND ORDER

CROW, Senior District Judge.

This is an action to review the final decision of the defendant Commissioner of Social Security ("Commissioner") denying the plaintiff Martha P. Vogt's application for disability insurance benefits under Title II of the Social Security Act. The case is ripe for decision on the parties briefs filed pursuant to D.Kan. Rule 83.7.

## PROCEDURAL HISTORY

Martha Vogt first filed an application for disability benefits on December 28, 1990. The application was denied initially and was not pursued. The plaintiff filed another application on September 6, 1991. This application was denied initially and on reconsideration. The administrative law judge ("ALJ") reopened the prior determination. Following the hearing on October 31, 1994, the ALJ issued his decision on December 23, 1994. The ALJ found that the plaintiff was not under a "disability" as that term is defined under the Social Security Act at any time through March 31, 1985, the date she was last insured. After considering additional evidence submitted by the plaintiff, the Appeals Council denied the plaintiff's request for review. Thus, the ALJ's decision stands as the Secretary's final decision. *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir.1994) (citing *See* 20 C.F.R. § 404.981).

## STANDARD OF REVIEW

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401–02, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971); *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989). "A finding of ' "no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence." ' " *Trimiar v. Sullivan*, 966 F.2d 1326, 1328 (10th Cir.1992) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir.1983)) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir.1973)). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d at 858 (citation omitted).

The court's review also extends to determining whether the Secretary applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir.1994). Besides the lack of substantial evidence, reversal may be appropriate when the Secretary uses the wrong legal standards or the Secretary fails to demonstrate reliance on the correct legal standards. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.1994).

The court's duty to assess whether substantial evidence exists:

"is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.' "

*Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler*, 760 F.2d 1052, 1055 (10th Cir.1985)). The court is not to reweigh the evidence or substitute its judgment for the Secretary's. *Glass v. Shalala*, 43 F.3d at 1395. The court typically defers to the ALJ on issues of witness credibility. *Hamilton v. Secretary of Health & Human Services*, 961 F.2d 1495, 1498 (10th Cir.1992). The courts, however, do not mechanically accept the Secretary's findings. *Claassen v. Heckler*, 600 F.Supp. 1507, 1509 (D.Kan.1985); *see Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534, 538 (7th Cir.1992) ("By the same token, we must do more than merely rubber stamp the decisions of the Secretary." (citation omitted)). Nor will the findings be affirmed by isolating facts and labelling them substantial evidence, as the court must scrutinize the entire record in determining whether the Secretary's conclusions are rational. *Holloway v. Heckler*, 607 F.Supp. 71, 72 (D.Kan.1985). " 'We examine the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on that basis determine if the substantiality of the evidence test has been met.' " *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir.1994) (quoting *Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800–01 (10th Cir.1991)); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951).

Any new evidence submitted to the Appeals Council and considered by it in denying a request for review becomes a part of the administrative record. *O'Dell v. Shalala*, 44 F.3d at 859; *Jones v. Sullivan*, 804 F.Supp.

1398, 1404 (D.Kan.1992). Thus, the court reviews the ALJ's decision for substantial evidence considering not only the evidence before the ALJ but also the evidence first submitted to the Appeals Council. *Id.*

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan,* 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 423(d)(2)(A). The claimant has the burden of proving a disability that prevents him from engaging in his prior work for a continuous period of twelve months. *Trimiar,* 966 F.2d at 1329. The burden then shifts to the Secretary to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir. 1989). The Secretary satisfies this burden if substantial evidence supports it. *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993).

For evaluating a claim of disability, the Secretary has developed a five-step sequential process. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). This process comes to an end if at any point the Secretary determines the claimant is disabled or not. *Gossett,* 862 F.2d at 805. Step one is whether the claimant is currently engaged in substantial gainful activity. If not, the fact finder next considers whether "the claimant has a medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291. Step three entails determining whether the impairment is equivalent to one of a number of impairments found in the "Listing of Impairments," 20 C.F.R. Part 404, Subpt. P, App. 1, which the Secretary acknowledges are so severe as to preclude substantial gainful activity. If no equivalency, the claimant must show that because of the impairment he is unable to perform his past work. The final step is to determine whether the claimant has the residual functional capacity (RFC) to perform other work available in the national economy, considering such additional factors as age, education, and past work experience. *See Williams v. Bowen,* 844 F.2d 748, 750–52 (10th Cir.1988).

## ALJ'S FINDINGS

In his order of December 23, 1994, the ALJ made the following findings:

1. The claimant met the earnings requirements of the Act on March 1, 1978, the date she stated she became unable to work, and continued to meet them through March 31, 1985.

2. The claimant did not engage in substantial gainful activity from March 1, 1978.

3. The medical evidence establishes that the claimant has the following severe impairments: mild coronary disease, fibromyalgia, mitral valve calcification and Hashimoto's thyroiditis. Nevertheless, she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony, that of the witnesses and allegations of the affiants are not found credible when considered, in light of the medical signs and findings, history of medical treatment, the reports of treating and examining physicians and the inconsistencies in claimant's testimony, all of which are discussed more fully in the Rationale section of this decision.

5. The claimant has the residual functional capacity to perform work-related activities except for work involving lifting or carrying more than 20 pounds maximum occasionally and 10 pounds frequently, walking more than 1 hour, standing more than 3 hours, sitting more than 6 hours and bending or reaching more than occasionally (20 CFR 404.1545).

6. The claimant's past relevant work as a field editor did not require the perfor-

mance of work related activities precluded by the above limitations (20 CFR 404.1565).

7. The claimant impairments did not prevent her from performing her past relevant work as a field editor.

8. The claimant was not under a disability as defined in the Social Security Act, as amended, at anytime through the date last insured of March 31, 1985 (20 CFR 404.1520(e)).

(Tr. 24).

## SUMMARY OF ARGUMENTS

The claimant argues the ALJ overlooked important medical evidence, mistakenly relied on Dr. Peter Olson's opinions rather than findings, ignored opinions of treating physicians without good cause, misinterpreted medical records, and rendered a decision without properly identifying the plaintiff's principal impairment. The ALJ's analysis and conclusion is contrary to *Sisco v. U.S. Dept. of Health and Human Services*, 10 F.3d 739 (10th Cir.1993). The ALJ did not use the plaintiff's amended onset date in evaluating the plaintiff's disability. The ALJ failed to call a vocational expert when the plaintiff had both exertional and non-exertional impairments. The Commissioner failed to develop an adequate record of the plaintiff's back impairment. The ALJ failed to explain his finding on step three. The ALJ erred in not giving proper weight to all of the plaintiff's treating physicians.

## FACTS

The plaintiff was born September 25, 1935, making her forty-nine years of age on March 31, 1985, the last date on which she was covered, and fifty-nine years of age on October 31, 1994, the date of the hearing. Ms. Vogt has a bachelor of arts degree in Humanities.

Ms. Vogt has worked for various newspapers in the capacity as editor, reporter, or writer. Her last employment was with a local newspaper in Cedar Springs, Michigan in 1983, serving as its editor, reporter, and photographer. The newspaper permitted her to keep an irregular schedule to accommodate her health problems. Ms. Vogt estimates she was able to work three days a week and approximately twenty-five hours a week. During this time, Ms. Vogt weighed approximately 150 pounds.[1]

After six months, she quit her last job due to fatigue, exhaustion, and sensitivity to chemicals.[2] She also had difficulty breathing around smoke and had experienced fainting spells from exposure to the chemicals used in the newspaper business. During this same period, Ms. Vogt suffered from joint pain and swelling in her knees, ankles, and hands. She described herself as clumsy dropping things and struggling to complete a simple layout. She recounted her pain as everywhere, in particular her joints and back. Her exhaustion, weakness and pain sometimes made it impossible for her even to carry a camera or tape recorder. On some weekends, Ms. Vogt testified that she was not able to do anything but stay in bed hoping to regain her strength for the next work week.

In 1983, Ms. Vogt was not physically able to perform most of her household duties. She had hired a cleaning lady and her family helped with the other tasks. She cooked fewer meals for her family. Ms. Vogt has written two books, both of which were published in the 1980's but were written between 1973 and 1980. She no longer attends church because of her health, in particular her allergy to perfume.

In December of 1984, Ms. Vogt travelled to Germany with her husband. Her husband had earned this free trip which expired at the

---

1. At the time of the hearing, Ms. Vogt weighed approximately 200 pounds.

2. Ms. Vogt testified that her difficulties with working began in 1978 after she suffered what was later diagnosed as a heart attack. Fatigued and needing naps, Ms. Vogt's employer at the time, a different newspaper in Michigan, terminated her but later rehired her. Ms. Vogt later resigned because the fatigue kept her from doing her job. While working for that newspaper, Ms. Vogt weighed 135 pounds. In 1979, Ms. Vogt tried working for a newspaper in Nebraska. She was not able to work longer than five months when the fatigue overtook her. Two years later, Ms. Vogt tried her last job as editor for the local Michigan newspaper.

end of 1984. Hoping Ms. Vogt's condition would improve, they waited until December 30, 1984, when they decided to risk the trip regardless of her condition. Her husband described the trip as a "fiasco." She was fatigued throughout the trip and unable to keep to any schedule. She frequently cried and was exposed to many things to which she was allergic. She experienced feelings of depression and even suicidal impulses. She and her husband have not taken any more trips since this one.

Several physicians have diagnosed Ms. Vogt as suffering from Chronic Fatigue Syndrome ("CFS"). David Steinhaus, M.D., in 1991; Joseph Brewer, M.D., in 1991, 1993, 1994, and 1995; Paula G. Davey, M.D. in 1994, and 1995; and Dennis Cowan Ed. D. in 1993 diagnosed Ms. Vogt as having CFS or, at least, said that she was experiencing and displaying conditions consistent with CFS.

Dr. Brewer began treating the plaintiff in 1990, and his opinion after the initial evaluation was that Ms. Vogt was disabled and suffered most likely from CFS. (Tr. 169). In 1993, Dr. Brewer gave the following opinion:

I have been following Mrs. Vogt since April 1990. Additionally, I have reviewed a number of her past medical records from Dr. Paula Davey in Ann Arbor, Michigan. Mrs. Vogt has a longstanding illness dating back to about 1978 with severe waxing and waning symptoms. Symptoms from this illness include severe, unrelenting fatigue, awakening unrested after sleep, abrupt onset of the illness, excess sleep requirements (12 to 14 hours per day), sleep disorder, marked diminishment in activity capabilities, myalgias, arthralgias, fever, night sweats, recurrent sore throats, muscle weakness, numerous allergies, marked chemical hypersensitivities, mood swings, neurocognitive difficulties (particularly short term memory, attention span and communication skills), severe anxiety attacks, dizziness, weight gain, light and sound sensitivity, heart palpitations, episodes of near syncope, and low blood pressure. In reviewing all of this, it is my medical opinion that her diagnosis is quite consistent with chronic fatigue syndrome in accordance with the CDC [Center for Disease Control] case definition. Furthermore, I think this disorder has been ongoing since her original onset of symptomatology in the late 1970s. Her illness has shown no tendency whatsoever toward improvement and there is no effective therapy for this condition at the present time. I do not think she can participate in work related activities such as sitting, standing, moving about, lifting, carrying or handling objects, and be involved with communication skills. Her ability to do these activities has probably not changed appreciably over the last several years.

*IN SUMMARY,* it is my opinion that Mrs. Vogt has been suffering for many years now with chronic fatigue syndrome which has not improved spontaneously. I think she has been disabled from that condition and continues to remain disabled. I do not see any likelihood of improvement in the foreseeable future and I do not think she can work in any gainful capacity.

(Tr. 283–284). Dr. Brewer's medical notes from September of 1993 state, in relevant part: "All of this continues to be consistent with chronic fatigue syndrome with very severe symptomatology almost all of the time now." (Tr. 292).

Dr. Brewer referred Ms. Vogt for a neuropsychological consultation evaluation. The report from this consultation observed that Ms. Vogt "has a history having been a very high achiever and a 'type A' personality having worked 2–3 jobs simultaneously as well as attempting to do her own writing." (Tr. 298). The opinion reported was that "with this degree of neurocognitive dysfunction, memory disturbance, diminished speed of mentation, as well as abstract reasoning problems, I do no (sic) perceive how this patient could be gainfully employed." "It is my belief that this patient would manifest very significant errors and experience such difficulties that would be a hindrance and inability for her to perform the required jobs/roles." (Tr. 302).

Dr. Davey treated Ms. Vogt from April of 1984 through April of 1986. In November of 1991, Dr. Davey summarized her treatment of Ms. Vogt for allergies:

Her diagnosis in 1984 were fatigue, marked chemical sensitivity, candidiasis, food sensitivity, inhalant sensitivity, hypoglycemia, obesity, thyroid insufficiency, myocardial infarction by history in 1978, arthralgia, fibromyositis, depression, and tinnitus.... Her problems have continued over the years through 1986 after which she moved to Kansas.

. . . .

Mrs. Vogt's ability to lift, carry, handling objects, to think clearly, travel, and speak will depend on the degree of exposure that may be present at that time. In most work environments, copiers, perfumes, tobacco smoke, cleaners, disinfectants, fabric softener on other people's clothes, office supply materials, dry cleaned clothes and other chemical odors would (sic) may set off a reaction which would limit the amount and ability to do any of the above. Mrs. Vogt by controlling her environmental exposures is able to manage her personal life and do those things necessary to preserve her health.... It is my opinion that Mrs. Vogt is totally disabled at the time she was seen and would not be able to engage in any gainful employment.

(Tr. 212–13). Dr. Davey's testing for allergies in 1984 confirmed the plaintiff's serious allergic reactions to glycerine, benzyl alcohol, auto exhaust, molds, dust, mites, phenol, and many foods. Her medications during that period were allergy antigen therapy, Xanax, Synthroid, Motrin for pain, and oxygen for respiratory problems caused by allergic exposures. In 1993, Dr. Davey opined that Ms. Vogt's "multiple medical problems and her predominate chemical sensitivity totally disabled her from performing any gainful employment." (Tr. 281).

In January of 1994, Dr. Davey explained that her prior diagnoses were incomplete:

In my last report dated November 22, 1991, I noted that Ms. Vogt's diagnoses were arthralgia, fibromyalgia, depression, and extreme fatigue (as well as multiple allergies, hypothyroidism, hypoglycemia, and a myocardial infarction by history). She continues to have arthralgia, fibromyalgia, and fibromyositis, depression, and extreme fatigue. Her symptoms go back to at least 1984 and meet the criteria for chronic fatigue syndrome. At the time of the last report she had these same symptoms and diagnoses which are consistent with the diagnosis of chronic fatigue syndrome although the diagnosis was less well defined when the last report was written.

(Tr. 362). In 1995, Dr. Davey restated her treatment and further explained her diagnoses and the plaintiff's continuing circumstances:

Mrs. Vogt has been under considerable strain for many years due to her fatigue and other symptoms, due to financial and other social stresses. I do not believe she has psychological or emotional problems. Because of advancements of the state of medicine chronic fatigue syndrome is now a recognized diagnosis with better definition of criteria. This was not a recognized diagnosis in the 1980's. Mrs. Vogt's illness fits the criteria for the diagnosis of chronic fatigue syndrome and was present since the early and mid–1980's.

(Tr. 468).

Peter Olson, M.D., actively treated Ms. Vogt from 1983 through 1985. His narrative report dated March 11, 1991, to Social and Rehabilitation Services reads in relevant part:

I hope all this information is of help to you and certainly will more or less document the fact that the patient does not have a significant history of heart disease. I've also included my progress notes from 1983—1985. You will see from these reports also that there has been no major problems. I believe that a lot of the patient's problems, as you can see from my enclosed notes, were more or less psychologically based or functional in nature. Although her EKG's and ventriculography show a possibility of an old inferior wall MI, based on the hypokinesis and subtle EKG changes, her ejection fraction was found to be 77%, which is obviously normal. This would obviously be only mild coronary disease at best.

(Tr. 171). Ms. Vogt first saw Dr. Olson in 1983 to be evaluated for possible coronary artery disease. Dr. Olson recorded her com-

plaints of fatigue, and his impression was that the fatigue was probably due to a mild depression but that other causes would need to be ruled out. Dr. Olson's notes on January 21, 1983, state in part: "We reviewed the work-up for fatigue. The patient really denies any of these overt symptoms. We more or less focused on a discussion on depression." Dr. Olson then started Ms. Vogt on anti-depressants as he believed depression was causing her fatigue.

In November of 1983, Dr. Olson observed that Ms. Vogt "continues to have profound fatigue as well as up and down periods." (Tr. 177). Dr. Olson wrote that he had evaluated her for "simple causes of fatigue and I do not see any of those forthcoming." He further noted that the chronic nature of the symptoms indicates a "psychogenic basis." (Tr. 177). He then increased her dosage of anti-depressants. In January of 1984, Dr. Olson again saw Ms. Vogt and wrote: "She however presently suffers some fatigue which is non-descript and she is not having any symptoms cardio-wise." (Tr. 176). Dr. Olson's notes for February 13, 1984, reveal that Ms. Vogt was having tinnitus, facial swelling and some arthralgias that lasted for twenty-four hours. Because of her mental depression and the variety of her complaints, Dr. Olson wrote that fibromyalgia was a possible diagnosis. (Tr. 176). At that time, he also suggested psychological counseling. In March, Dr. Olson prescribed Naprosyn and Elavil for her fibromyalgia.

In October of 1984, Dr. Olson called the Vogt home to speak with Ms. Vogt's daughter but ended up speaking with Ms. Vogt. His notes state:

She again is anxious and she again seems to want to relate to me all of her minute symptoms which seem to have very dubious medical significance. Because of the persistent complaints that she has I think we should undergo a complete and through (sic) workup to eliminate any organic causes for these.... I feel that she has a great amount of functionality to her problems but I think because of the chronic as well as the perceived incapacitating nature of her problems to herself and her family I

think a more thorough workup should be undertaken at this time.

(Tr. 174). A week later, Dr. Olson recorded another contact with Ms. Vogt expressing his frustration with Ms. Vogt's repeated contacts with his office and Ms. Vogt's efforts to contact other physicians without asking him first for a referral. His notes reflect: "If she continues to act on her own and not follow through with my recommendations after I have taken the time to talk to her as well as make the appropriate referrals ... I will have to be forced to have to ask her to leave my practice to seek some other medical care since she is taking up a great deal of my time unnecessarily." (Tr. 174).

In November of 1984, Dr. Olson spoke with Ms. Vogt by telephone and discussed the need to remove a cervical polyp. He also encouraged her to follow through on his referral to a cardiologist for a complete workup. It was his impression that her fibromyalgia and anxiety were "satisfactorily controlled" with medication but that she "could benefit from bio-feedback, stress management counseling ... as well as individual psychological counseling." (Tr. 172). The notes also reflect:

She also added that she has been taking oxygen which I do not approve of since I do not see any rational reason why she should be taking it. She seems to be somewhat benefitted. I told her I am at a loss to explain why. Apparently she was started on this by her allergist for this but I don't understand the rational (sic) for using it. I suggested again today that I would be more than happy to have her see Dr. Gonzales one of our leading immunologists in this city and would be happy to make arrangements anytime as I would a neurologist if requested.

(Tr. 172). All of Dr. Olson's notes for October and November of 1984 stem from his telephone conversations with Ms. Vogt, and these same notes do not show that during this period he physically examined or administered any other tests based on her complaints. After November of 1984, Dr. Olson's notes show only prescription refills and contain no recorded observations of his treatment he administered, if any.

## ALJ'S CREDIBILITY FINDINGS

In rejecting Ms. Vogt's allegations of disability, the witnesses' testimony concerning the plaintiff's pain and other problems, Ms. Vogt's testimony on her subjective complaints and functional restrictions, the ALJ each time said that this evidence was "inconsistent with" the following:

the lack of medical evidence from the alleged onset date through January 1983; the normal thyroid test of January 1983; the normal laboratory and diagnostic tests performed by Dr. Olson in December 1983; the notation by Dr. Olson in March 1984 that the claimant's anxiety was controlled by medication; the November 1984 notation by Dr. Olson that the claimant's fibromyalgia and anxiety were controlled by her medical regimen; the observation of Dr. Olson in November 1984 that there was no rational reason for the claimant to take oxygen; the claimant's ECG in December 1984 which revealed normal left ventricular function; the normal results obtained from the physical examination and laboratory and diagnostic tests by Dr. Evans in December 1984; the normal pulmonary function test of May 1985; the statement of Dr. Olson in March 1991 that the claimant had mild coronary disease, at best, based upon her ejection fraction of 77%; the statement of Dr. Olson in March 1991 that a review of his clinical notes from 1983 through 1985 revealed no major problems; and the work activity report which reveals the claimant earned wages of $3,640 in 1981 and $5,400.00 in 1983.

(Tr. 20, 21, 22–23). The ALJ rejected Dr. Davey's retrospective diagnosis of Chronic Fatigue Syndrome ("CFS") and essentially found that medical evidence did not establish the plaintiff as suffering from CFS. In that regard, the ALJ does not even mention the same retrospective diagnosis of CFS by Dr. Brewer. The ALJ's decision is incompatible with existing standards and guidelines of the medical community for diagnosing CFS.

## CHRONIC FATIGUE SYNDROME

"Chronic fatigue syndrome is a disease that did not become widely known in the medical community until 1988 when the first diagnostic article concerning it was published. It was also in 1988 that the Centers for Disease Control in Atlanta accepted chronic fatigue syndrome as a disease." *Sisco*, 10 F.3d at 740–41. Professional guidelines for evaluating and studying CFS were developed by the International Chronic Fatigue Syndrome Study Group. *Fragale v. Chater*, 916 F.Supp. 249, 253 (W.D.N.Y.1996) (citing Fudka, Straus, Hickie, Sharpe, Dobbins and Komaroff, *The Chronic Fatigue Syndrome: A Comprehensive Approach to Its Definition and Study*, Annals of Internal Medicine, Vol. 121, No. 12, pp. 945–59 (Dec. 15.1994) ("Guidelines")). The Guidelines describe CFS as " 'a clinically defined condition characterized by severe disabling fatigue and a combination of symptoms that prominently features self-reported impairments in concentration and short-term memory, sleep disturbances, and musculoskeletal pain.' " *Fragale*, 916 F.Supp. at 253 (quoting Guidelines at 953). As far as diagnosis, the Guidelines recommend:

CFS classification, if, after other diagnostic possibilities have been excluded through a series of clinical examinations and testing, the subject reports persistent or relapsing fatigue for 6 or more consecutive months and exhibits four or more of the following symptoms concurrently for 6 or more consecutive months:

1.  impaired memory or concentration;

2.  sore throat;

3.  tender cervical or axillary lymph nodes;

4.  muscle pain;

5.  multi-joint pain;

6.  new headaches;

7.  unrefreshing sleep; and

8.  post-exertion malaise.

*Fragale*, 916 F.Supp. at 253 (quoting Guidelines at 955). Suffice it to say, CFS is a complex illness characterized by incapacitating fatigue and "a constellation of other symptoms that can resemble many disorders, including mononucleosis, multiple sclerosis, fibromyalgia, AIDS-related complex (ARC), Lyme disease, post-polio syndrome, and autoimmune diseases." *Bortnick v. Shalala*,

No. 94–0040, 1995 WL 131073, at *2 (E.D.La. Mar.22, 1995) (citation omitted).

"In section DI 24575.005 of the Secretary's Program Operations Manual System (1993) POMS, the Secretary established a policy for the evaluation of claims premised on CFS." *Rose v. Shalala,* 34 F.3d 13, 16 (1st Cir.1994); *cf. Sisco,* 10 F.3d at 744. The policy promulgated in November of 1993 provides in relevant part:

> Chronic Fatigue Syndrome (CFS), previously known as Chronic Epstein–Barr Virus Syndrome, and also currently called Chronic Fatigue and Immune Dysfunction Syndrome, is a systemic disorder consisting of a complex of variable signs and symptoms which may vary in duration and severity. The etiology and pathology of the disorder have not been established. Although there are no generally accepted criteria for the diagnosis of cases of CFS, an operational concept is used by the medical community. There is no specific treatment, and manifestations of the syndrome are treated symptomatically.
>
> CFS is characterized by the presence of persistent unexplained fatigue and by the chronicity of other symptoms. The most prevalent symptoms include episodes of low-grade fever, myalgias, headache, painful lymph nodes, and problems with memory and concentration. These symptoms fluctuate in frequency and severity and may be seen to continue over a period of many months. Physical examination may be within normal limits. Individual cases must be adjudicated on the basis of the totality of evidence, including the clinical course from the onset of the illness, symptoms, signs, and laboratory findings. Consideration should be given to onset, duration, severity and residual functional capacity following the sequential evaluation process.

*Rose v. Shalala,* 34 F.3d at 16–17. This policy was in effect when the ALJ decided this case.

■ This policy establishes the Commissioner's "acceptance of certain propositions concerning the nature and diagnosis of CFS." 34 F.3d at 17. "[T]here is no 'dipstick' laboratory test for chronic fatigue syndrome."

*Sisco,* 10 F.3d at 744. The lack of a conclusive diagnosis of CFS in a laboratory setting does not automatically exclude a claimant from coverage. *Id.* "The 'operational' diagnosis technique used by the medical community at the present time involves testing, the matching of a detailed list of symptoms, the painstaking exclusion of other possible disorders, and a thorough review of the patient's medical history." *Sisco,* 10 F.3d at 744.

■ Several inferences can be drawn from these propositions. Because the diagnostic technique for CFS uses a process of testing and treating other possible causes of symptoms, it is not unusual for early medical reports to reflect failed efforts to diagnose and concerns of hypochondria, personality, or psychosomatic or psychological overlay. *Sisco,* 10 F.3d at 744–45. The Tenth Circuit observed there:

> A review of the medical literature in the record demonstrates that a psychological overlap is consistent with a diagnosis of chronic fatigue syndrome; it often develops as a secondary reaction to the physical aspects of the disease.... Furthermore, an overlap is simply an overlap. It does not change the nature of the underlying diagnosis.

*Sisco,* 10 F.3d at 744 n. 1. It necessarily follows that the inability of some doctors to make a conclusive diagnosis "does not constitute substantial evidence to support a finding that" the claimant does not have CFS. *Rose,* 34 F.3d at 18. It is critical in CFS cases that the claimant's medical history be read in the proper light as outlined above. *See Sisco,* 10 F.3d at 745. It also follows from the above that "the credibility of the claimant's testimony regarding her symptoms takes on 'substantially increased' significance in the ALJ's evaluation of the evidence." *Fragale,* 916 F.Supp. at 254 (citation omitted).

**ANALYSIS**

■ After thoroughly reviewing the record, the court is convinced that the ALJ's decision that the plaintiff can return to her past relevant work as a field editor is not supported by substantial evidence. Rather than discuss every error evident in the ALJ's decision, the court chooses to highlight the

more important ones in the interest of brevity.

The ALJ's extensive reliance on Dr. Olson's opinions is contrary to the Commissioner's policy on CFS and to the medical community's current knowledge and diagnosis of CFS. Dr. Olson's notes show that the plaintiff saw him principally for complaints of possible coronary artery disease. The opinions of Dr. Olson reflect his overriding attention to the plaintiff's heart condition.[3] Dr. Olson's active treatment of the plaintiff ended almost four years before the medical community was provided with the first diagnostic article concerning CFS. This is not to say that Dr. Olson's records and observations are not relevant, but they must read in the light relevant to CFS.

Dr. Olson's records demonstrate that the plaintiff continuously sought treatment for a chronic and debilitating fatigue and that her family relayed their concerns about the plaintiff's fatigue to Dr. Olson. Unable to link the fatigue to a coronary problem, Dr. Olson initially considered depression as the cause. The treatment for depression did not offer the plaintiff much relief, as Dr. Olson noted that Ms. Vogt "continues to have profound fatigue as well as up and down periods." (Tr. 177). After ruling out the more common or expected causes of fatigue, Dr. Olson then considered fibromyalgia because of the symptoms of tinnitus, facial swelling, mental depression and arthralgia. Dr. Olson mentioned the psychological difficulty the plaintiff was having with her chronic condition, and he advised her to seek psychological counseling. It is true that Dr. Olson's narrative report prepared in 1991 makes no mention of CFS. There is, however, no suggestion anywhere in the record that Dr. Olson ever considered the possible diagnosis of CFS in his care and treatment of the plaintiff or in his evaluation of the plaintiff's medical records. Consequently, there is no basis for inferring that Dr. Olson ruled out a diagnosis of CFS. Dr. Olson's opinions and tests fall in the very category of an early medical report where the physician is still searching for the cause of the patient's profound symptoms. Dr. Olson's inability to arrive at a CFS diagnosis is not substantial evidence. *See Rose*, 34 F.3d at 18.

The ALJ's extensive reliance on normal test results is also misplaced. The Commissioner's policy recognizes that a person may suffer from CFS though the physical examination may be within normal limits. All of the extant medical literature and case law emphasizes there is no "dipstick test" for CFS. If anything, the normal test results do not rule out CFS but rule in the likelihood of CFS, because the laboratory test results eliminate those other possible causes that may be detectable in the results.

The ALJ discounted Dr. Davey's diagnosis of CFS in the following manner:

As for the opinion of Dr. Davey that the claimant was disabled, the undersigned finds it to be inconsistent with the opinion offered by Dr. Olson in March 1991 and the medical evidence cited above. It is also inherently inconsistent in that Dr. Davey first stated the claimant was disabled in 1984 by sensitivity to chemicals, food and inhalants in a November 1991 letter and then stated she was disabled in 1984 by chronic fatigue syndrome in a January 1994 letter. There were no other treating or examining physicians of record during the period in question who noted signs or symptoms of the severity reported by Dr. Davey or made corroborating diagnosis.

---

**3.** The ALJ extracts from Dr. Olson's narrative report his conclusion that the notes show "that there has been no major problems." (Tr. 171). The context for this conclusion is revealed in Dr. Olson's next sentence: "I believe that a lot of the patient's problems, as you can see from my enclosed notes, were more or less psychologically based or functional in nature." (Tr. 171). At the same time, Dr. Olson's notes also show that he believed the plaintiff and the plaintiff's family that she was suffering from her complaints. His notes show that he repeatedly treated her complaints with various prescriptions, tentatively diagnosed fibromyalgia, offered and made referrals for more complete evaluations, and also encouraged her to seek psychological counseling. In short, the notes reflect that Dr. Olson believed the plaintiff suffered from chronic and incapacitating symptoms but he was not able to diagnose them as "major" *medical* "problems."

(Tr. 21).[4]  The ALJ's reasons are not logical and are contradicted by the medical community's current understanding of CFS and the diagnostic technique used for CFS. First, the ALJ utterly fails to discuss the medical tests performed by Dr. Davey to verify the plaintiff's various allergies. Dr. Davey's medical records corroborate the severity of the plaintiff's claimed reactions to different chemicals commonly found in work environments, particularly those associated with the plaintiff's past relevant work. As far as medical evidence of record, Dr. Davey is the only physician who treated the plaintiff for allergies, and Dr. Olson's disagreement with the oxygen treatment is hardly significant considering that Dr. Davey was a specialist in environmental medicine and Dr. Olson was not treating the plaintiff for allergies but principally for a coronary condition. Consequently, the ALJ ignored uncontroverted evidence of an impairment presented through a treating physician.

Second, the ALJ does not account for the unique nature of CFS in discounting Dr. Davey's opinion as "inherently inconsistent." Considering the diagnostic technique used for CFS, it is entirely plausible that Dr. Davey would not be able to diagnose CFS until she and the medical community became more knowledgeable of CFS and until after more medical tests and examinations were done. Dr. Davey said as much in her letter opinion of January 1994. Courts have recognized that sometimes a later diagnosis can provide an explanation for symptoms which the claimant began experiencing much earlier. *Jones v. Sullivan*, 804 F.Supp. 1398, 1404 (D.Kan.1992). As for corroborating medical opinions, they exist in the opinions of Dr. Brewer, Dr. Steinhaus, and Dennis Cowan; all of whom diagnosed a constellation of symptoms consistent with CFS.[5] "[A]n ALJ is not free to substitute his own judgment for

uncontroverted medical opinion." *Rose*, 34 F.3d at 18 (citation omitted).

The ALJ's credibility evaluations of the plaintiff and her witnesses are not supported by substantial evidence. The plaintiff's complaints of pain and fatigue are for the most part consistent with CFS symptoms recognized by the medical community and the Commissioner. The records and notes of the different treating physicians document the plaintiff's allegations of symptoms. Instead of any detailed analysis of the extent that the fatigue and pain impaired the plaintiff's RFC, the ALJ blindly and erroneously relied on what he considered to be the absence of objective medical evidence.

Since the plaintiff properly amended her onset date to September of 1983, the plaintiff's failure to submit medical evidence for the period between 1978 and January of 1983 is not overly significant. Indeed, the court does not see any reasonable inference to be drawn from the fact that there is no such evidence **in the record.** Likewise, the plaintiff's ability to work part-time in 1981 and 1983 is not inconsistent with her testimony on fatigue or with the recognized symptoms of CFS. "One of the more perplexing aspects of CFS" is the daily fluctuation in condition—"[o]ne day they can function reasonably well, while on another day they may be unable to get out of bed." *Irwin v. Shalala*, 840 F.Supp. 751, 763 (D.Or.1993) (citation omitted).

As have been discussed above, the plaintiff's subjective complaints are consistent with the symptomatology for CFS recognized by the Commissioner, are documented in medical records, and are corroborated by testimony from family members. Again, as has been stated above, in rejecting the plaintiff's testimony and allegations, the ALJ used evidence that either was not significant or reliable in the context of CFS. The ALJ does

---

**4.**  "The Secretary must give substantial weight to the evidence and opinion of the claimant's treating physician, unless good cause is shown for rejecting it. If an ALJ rejects the opinion of a treating physician, he or she must articulate specific, legitimate reasons for doing so." *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994) (citation and quotations omitted).

**5.**  Arguably, Dr. Olson's diagnosis of fibromyalgia "is not inconsistent with a diagnosis of CFS."

*Fragale v. Chater*, 916 F.Supp. at 254 (citation omitted). Dr. Olson's notes also reflect that he believed the fibromyalgia was "satisfactorily controlled" by the medications. (Tr. 172). His notes, however, do not show that the plaintiff's complaints of fatigue and depression had subsided or ended. In fact, he was still convinced of the plaintiff's need for psychological counseling.

not refer to anything in the plaintiff's employment history which suggests a poor work ethic. The ALJ's opinion finds no inconsistencies in the plaintiff's testimony on her daily activities and her symptom complaints.

For all of the above reasons, the ALJ's finding that the plaintiff is capable of performing her past relevant work and sedentary work is not supported by substantial evidence. "Because sedentary work is the lowest classification under the statute, there is no need for further proceedings in this matter other than a remand for an award of benefits." *Sisco,* 10 F.3d at 745–46 (citation omitted). "'Outright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose.'" *Sorenson,* 888 F.2d at 713 (quoting *Williams,* 844 F.2d at 760). The evidence of record is substantial that after September 1, 1983, the plaintiff suffered from the impairments of CFS and marked chemical sensitivity which were of such severity as to preclude her from doing her past relevant work and from performing full-time sedentary work.

IT IS THEREFORE ORDERED that the Commissioner's decision denying disability benefits to the plaintiff is reversed, and the case is remanded to the Commissioner for an immediate award of benefits.