**Janice S. ESTOK, Plaintiff–Appellant,**

**v.**

**Kenneth S. APFEL, Commissioner of Social Security, Defendant–Appellee.**

No. 98–1080.

United States Court of Appeals, Seventh Circuit.

Argued July 8, 1988.

Decided Aug. 5, 1998.

Terry R. Boesch, Amy N. Kendt (argued), Valparaiso, IN, for Plaintiff–Appellant.

Andrew B. Baker, Jr., Office of the United States Attorney, Dyer, IN; Kathryn Beverly (argued), Social Security Administration, Office of the General Counsel, Chicago, IL, for Defendant–Appellee.

Before ESCHBACH, FLAUM, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

In June 1989, Janice S. Estok filed a claim for disability benefits under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), alleging that she suffered from pain in both feet (diagnosed at the time as pinched ankle nerves and tarsal tunnel syndrome), and that she had stopped working as a beautician in June 1987 due to the foot pain. After an evidentiary hearing in 1990, an administrative law judge (ALJ) concluded that Estok could perform the full range of unskilled sedentary work. In 1991, the Appeals Council denied review.

Estok filed a new claim in 1993, alleging pain in both feet (again tarsal tunnel syndrome) and scoliosis. After a March 1993 hearing, the ALJ found, in a decision dated June 13, 1994, that Estok did not qualify as disabled as of December 1992, the expiration date of her status as an insured individual. In October 1994, the Appeals Council remanded for review of additional medical evidence after Estok's treating physician offered a retrospective diagnosis of fibromyalgia [1] "as early as 1988." After a third hearing before an ALJ in February 1994, at which a medical expert testified, the ALJ denied the claim in a decision dated May 17, 1995, again finding that the impairments suffered by Estok prevented her from engaging in her past relevant work as a beautician, but that in light of her age (then 34 years old), education (high school and beauty school), job experience and residual functional capacity, she was capable of performing a full range of sedentary work and, furthermore, such work existed in the national economy. See 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). In 1996, the Appeals Council declined review, rendering the ALJ's decision the final decision of the Commissioner of Social Security. 20 C.F.R. § 404.981. Estok sought judicial review, 42 U.S.C. § 405(g), and the district court affirmed the Commissioner's decision. Estok filed this appeal, challenging the ALJ's May 17, 1995 decision. On appeal, Estok argues that substantial evidence does not support the ALJ's decision that as of December 31, 1992 she was still capable of performing sedentary work.[2] For the reasons given below, we affirm.

At the second and third hearings, the parties disputed the severity and date of onset of disability, i.e., whether Estok was completely disabled as of December 31, 1992, the last insured date. The medical history established that initially, in the mid–1980s, Estok experienced pain primarily in her feet and ankles, and she was diagnosed with tarsal tunnel syndrome. Various orthopedic surgeons treated her condition, including performing surgery on her right ankle in 1989, but the treatment and surgery did not improve the foot and ankle pain. At some point in time, Estok started to experience diffuse pain throughout her body, including pain in her hips, back, neck, arms, and hands, along

---

1. Fibromyalgia is a syndrome involving chronic widespread and diffuse pain throughout the entire body, frequently associated with fatigue, stiffness, skin tenderness, and fragmented sleep. See Robert M. Bennett, "The Fibromyalgia Syndrome," in The Textbook of Rheumatology 511, 511–14 (William N. Kelley et al. eds., W.B. Saunders Co. 5th ed.1997). See also Sarchet v. Chater, 78 F.3d 305, 306–07 (7th Cir.1996) (discussing this "common, but elusive and mysterious disease").

2. "The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately two hours during an eight-hour workday. If an individual can stand and walk for a total of slightly less than two hours per eight-hour workday, this, by itself, would not cause the occupational base to be significantly eroded. Conversely, a limitation to standing and walking for a total of only a few minutes during the workday would erode the unskilled sedentary occupational base significantly. For individuals able to stand and walk in between the slightly less than two hours and only a few minutes, it may be appropriate to consult a vocational resource."

with headaches, sleep disturbance, and depression. These problems were manifestations of fibromyalgia, which may have been a new condition. Or, the previous diagnosis of tarsal tunnel may have been inaccurate; perhaps the foot pain was actually an early manifestation of fibromyalgia. It was not until late 1993 that she was actually diagnosed with fibromyalgia. Later, several physicians retrospectively surmised, based on their long-term treatment of Estok and the medical records, that Estok had suffered from fibromyalgia even before December 31, 1992. No doctor opined that the initial diagnosis of tarsal tunnel was incorrect, although once fibromyalgia was diagnosed, the diagnosis of tarsal tunnel was mentioned only in a historical context. In any event, at the time of the last hearing in 1995, Estok undisputedly suffered from the rheumatological disease fibromyalgia.

This court's review focuses not on whether Estok was disabled during the relevant period, but instead on whether the ALJ's findings were supported by substantial evidence. *See Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995). "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotations omitted). The court on appeal reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *See Diaz*, 55 F.3d at 305, 308; *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir.1993).

No one disputes that Estok currently suffers from fibromyalgia and may now be totally disabled. In addition, no one questions that fibromyalgia is very difficult to diagnose, that no objective medical tests reveal its presence, and that it can be completely disabling. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996). Estok essentially argues that the ALJ failed to recognize that a retrospective diagnosis of fibromyalgia is substan-

tial evidence of disability during the relevant insured period.

The bottom line in this case, therefore, is that whatever the diagnosis—tarsal tunnel of the ankles and feet, or fibromyalgia throughout the body—Estok must provide sufficient evidence of actual disability before December 31, 1992. Benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. The claimant must show that she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Here, the record does not mandate a finding that Estok became disabled before the relevant period ended on December 31, 1992.

■ We first look at the problem of using retrospective diagnoses in Social Security cases. A physician's retrospective diagnosis is a medical opinion of the claimant's impairments which relates back to the covered period. *See, e.g., Likes v. Callahan*, 112 F.3d 189, 190–91 (5th Cir.1997); *Vogt v. Chater*, 958 F.Supp. 537 (D.Kan.1997). The ALJ believed that the retrospective diagnosis offered on remand from the Appeals Council was too speculative.

■ The key medical opinion focused on by the parties and the ALJ was provided by Dr. Brian Mandell, a rheumatologist in Cleveland, Ohio. Dr. Mandell wrote on January 5, 1994 that he had examined Estok on December 27, 1993 and diagnosed her condition as fibromyalgia. He began by stating that he would not "review in detail the entire past history," but that she had experienced "pain in both feet since 1987"; and she had "noted the onset of some stiffness in the low back in the *Fall of 1993*" (emphasis added). Estok also reported "an abnormal sleep pattern for many years, since the birth of [her] last child" in 1988, and she reported a "progressive loss of energy." Dr. Mandell's examination of Estok that day revealed:

> [Patient exhibited] significant trigger point tenderness in the calf muscles with

foot flexion, with diffuse tenderness to both feet. Patient also had diffuse symmetrical trigger points in the anserine, lateral greater than medial elbow, periscapular, trapezius, occiput, gluteal, trochanteric, and second costrachondral area. Reflex sympathetic dystrophy on her feet, was ruled out. Also ruled out was hypothyroidism.

Based on this "clinical presentation and testing," he diagnosed fibromyalgia.

Eight months later, on August 25, 1994, when the case was pending before the Appeals Council, Dr. Mandell provided a retrospective viewpoint that Estok had suffered from fibromyalgia prior to the expiration of her insured status; unlike his original assessment, he now pointed to the significance of the medical history prior to the "Fall 1993" period. After noting that Estok went through years of "complicated and often times repeated evaluations before finally being diagnosed with having fibromyalgia," he states:

> [I]t is my opinion that her underlying symptomatology has been characteristic of fibromyalgia for *several years* prior to my initial consult with her [on December 27, 1993], perhaps *as far back as 1988*, according to the medical records and reports that I have reviewed. (Emphasis added.)

In support of this diagnosis, Dr. Mandell pointed to the following symptoms: a "several year history of bilateral pain in her lower extremities"; a "history of diffuse pain beginning in the right hip and gluteal area, then spreading into multiple areas including both hips and calves"; "intermittent headaches and neck pain"; "progressive stiffness in the low back area"; "tingling in her hands radiating greatest on the middle finger with intermittent bluish dis-colorization of the feet and fingers"; "abnormal sleep patterns"; and a "progressive loss of energy."

This retrospective diagnosis was confirmed by another physician who had treated Estok during the insured period. Dr. Bruce J. Thoma, an orthopedic surgeon and foot/ankle specialist who treated Estok from 1988 through July 1992, wrote on June 27, 1995 that he agreed with Dr. Mandell's (August 25, 1994) opinion that the "original symptoms [of foot and leg pain] were the beginning of a clinical crescendo culminating in the diagnosis of fibromyalgia. Certainly these early manifestations existed prior to December of 1992." He agreed that it was certainly "possible [that] my initial workup and ... [diagnosis of] tarsal tunnel syndrome could have been in fact caused by the early manifestations of fibromyalgia perhaps masking and/or masquerading as tarsal tunnel syndrome."

The Appeals Council remanded with instruction that the ALJ consider Dr. Mandell's later (August 25, 1994) opinion and obtain the advice of a medical advisor. On remand, the medical advisor, Dr. Paul Glickman, a rheumatologist with extensive experience treating fibromyalgia, testified that he would agree with Dr. Mandell that Estok's fibromyalgia began in the late 1980s except for one problem—Dr. Mandell's first letter affixed the time of "Fall of 1993." Dr. Glickman testified, "The only thing that I find inconsistent is Dr. Mandell's report where he specifies time. If he didn't do that, I wouldn't find anything [inconsistent]...."

Dr. Mandell's naming the time period "Fall of 1993" as the beginning of Estok's back stiffness (and thus possibly fibromyalgia) is not the determinative factor in this case. Instead, the crucial problem is that the physicians providing the retrospective diagnosis of fibromyalgia offered no opinion as to the level of severity and disability that Estok's symptoms created in the past. Certainly the treating rheumatologist, Dr. Mandell, was entitled to retract his "Fall of 1993" statement and later opined that Estok's foot pain was caused by fibromyalgia "even as far back as 1988." That is the nature of a retrospective diagnosis, and physicians frequently make such diagnoses when they first examine or treat a person after the period to which the diagnosis pertains. Dr. Mandell never states in his initial report that the fibromyalgia did not begin (or become disabling) until Fall 1993; he never states that the foot problem is not caused by fibromyalgia. Nevertheless, he also does not state when Estok became disabled to the extent that she could not work at all.

■ On remand from the Appeals Council, the ALJ could have found a disability based in part on Dr. Mandell's retrospective opinion, but only if the factual evidence supported that retrospective diagnosis, and here it did not. A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period. *See Adams v. Chater,* 93 F.3d 712, 714 (10th Cir.1996); *Perez v. Chater,* 77 F.3d 41, 48 (2d Cir.1996); *Jones v. Chater,* 65 F.3d 102, 103–04 (8th Cir.1995); *Flaten v. Secretary of Health & Human Services,* 44 F.3d 1453, 1457–62 (9th Cir.1995); *Evangelista v. Secretary of Health & Human Services,* 826 F.2d 136, 140 (1st Cir.1987). The physicians said nothing about when (or if) Estok became disabled. Estok must establish through other evidence an actual disability during the insured period. It is not enough to show that she had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling. *See Sarchet,* 78 F.3d at 307.

In the considerable medical records before the ALJ, the records of the late 1980s and early 1990s contained only a few, cursory references to back pain and only a single reference to "diffuse, ill-defined pain and tenderness." The medical records and disability forms repeatedly point to foot and ankle pain, not the diffuse pain from which Estok now suffers, and repeatedly indicate that the condition changed and pain increased significantly after December 1992. Prior to that time, the records indicate, the pain prevented Estok from standing for long periods, but she could perform work while seated. Because the intensity or persistence of the pain was unsubstantiated, the ALJ properly examined and weighed all the evidence, including observations by treating and examining physicians and third-party testimony. He also reviewed the claimant's testimony about her pain and her daily activities, functional restrictions, pain medication taken, and aggravating or precipitating factors to evaluate the degree to which the claimant's impairment affected her ability to work. *See Herron v. Shalala,* 19 F.3d 329 (7th Cir.1994); 20 C.F.R. § 404.1529 (1993); Social Security Ruling 88–13. Substantial evidence supports the ALJ's conclusion that the record as a whole does not show that the pain was severe enough in Estok's feet, or had spread sufficiently to the rest of her body, to prevent her from performing sedentary work, which requires two hours or less of standing or walking in an eight-hour day.

■ For example, on December 7, 1987, Dr. Chung Kim, an orthopedic surgeon, wrote that Estok "shows evidence of bilateral tarsal tunnel syndrome" and suffered from foot pain. Although he stated that "[h]er prognosis is not optimistic at this time," the activity restrictions were limited to reduced standing and walking. "She was advised to change her job and do work which does not require walking or standing." Similarly, Estok's February 8, 1988 application for disability benefits states that her disabling condition is "pinched nerves in both ankles." There is no reference to any pain in other parts of her body or to other symptoms. The accompanying "disability report," with information provided by Estok, states that she suffered only from an "inability to stand" due to the "pinched nerves in both ankles." She reported that it was "very difficult to do normal daily activities such as cleaning, cooking, and grocery shopping, etc." However, she stated that her physician told her only to "stay off your feet." In contrast, she also stated that her physicians had placed no restrictions on her activities.

On January 31, 1989, Dr. Marvin E. Gold, an orthopedic surgeon, wrote that he had examined Estok on January 26, 1989, apparently on behalf of her insurance company. He reported that Estok complained of ankle and foot pain. She had "no history of low back pain," and her "general health was good." Dr. Gold recommended that Estok could "perform any work that does not place a lot of stress on her feet; for instance, any sedentary type of work." On February 9, 1989, Dr. E. Theodore Palm reviewed Dr. Gold's evaluation and agreed that Estok was "unable to work at any work that requires standing on her feet. She would be able to do sedentary work, however."

Estok's March 20, 1989 "Disability Report" states that her disabling condition was tarsal

tunnel syndrome. There is no reference to pain other than in her feet, again suggesting that fibromyalgia had not yet begun or significantly progressed. A disability form completed by Dr. Thoma and dated April 9, 1989 stated that he had last examined Estok on December 1, 1988. He now believed that her diagnosis was tarsal tunnel syndrome; she experienced daily pain, including "some rest pain," but her only functional restriction was "unable to stand." On August 25, 1989, Dr. Thoma confirmed this narrow restriction when he wrote to the insurer that "it is reasonable that this patient could be employed in another occupation commensurate with her training and experience that would not involve spending time on her feet.... If she had a sit down only type of work, her symptoms might well be alleviated."

Estok's September 6, 1989 request for reconsideration states, "I can't stand on my feet." A "reconsideration disability report" form dated September 15, 1989 states that since filing her claim, the foot pain had become "much more severe and a lot more often." Again, however, her "only limitation" was not standing "for any length of time." There is nothing indicating that she could not work while seated. A "disability report" form completed by Estok on December 2, 1989 states, "I feel that I cannot be depended upon in my condition." She added on the accompanying request for a hearing: "Very hard to do anything. Cannot participate in anything that requires any amount of standing. I cannot be [relied] upon," and "I am not at all dependable! I have severe pain whether standing or sitting." Yet on March 8, 1990, Dr. Thoma's notes indicate that the patient "can be up walking 2–3 hours" before the pain limits her activity. On May 1, 1990, Dr. Thoma wrote to the insurer that the ankle surgery "has not improved the condition" and added, "She is unable to perform her profession as a beautician in my medical opinion." However, he offered no restrictions as to other types of work.

Estok's "request for review" form dated July 31, 1990 states that the foot pain was "constant," "unbearable," and "severe," sometimes "the first thing in the morning [and thus] the entire day." She also stated that she was not the "same person ... emotionally." Yet on March 19, 1991, Dr. Thoma wrote to the insurer that Estok's condition was unchanged: "She continues to be unable to stand or walk for more than approximately two hours. I still feel she is unable to work as a beautician." No other restrictions were imposed.

A February 6, 1992 letter from Dr. Randall C. Morgan, an orthopedic physician, states that he had examined Estok on behalf of the insurance company. She reported having experienced increasing pain in both feet for four years. "The patient related that she was only able to stand approximately one to two hours maximum at a time." The pain "keeps her awake at night." Dr. Morgan stated that his impression was "bilateral peripheral neuropathy," and he recommended further tests to "rule out collagen disease." However, the only limitation he imposed involving standing: "I would not recommend work which would require prolonged standing. I do feel, however, that the patient could perform satisfactorily in a sedentary position."

Significantly, Dr. Charles Baran of St. Joseph's Center for Pain Rehabilitation wrote on August 24, 1992 (to Dr. Thoma) that except for the foot pain, Estok's "general health has been good," and she "has no pains anywhere else in her body." She was "becoming sort of depressed with the whole situation" but was "emotionally intact."

On December 31, 1992, Estok's insured status expired. Even after this date, however, the emphasis in the medical records and Estok's own statements continued to be on foot pain and problems with prolonged standing, and very little was said about the type of diffuse pain experienced in a disabling fibromyalgia, or the inability to perform sedentary work, until Fall 1993, nearly one year after the insured status expired.

For example, a "disability report" completed by Estok on April 5, 1993 states that her disabling condition is "bilateral tarsal syndrome and scoliosis of the back." She reported the lengthy history of visits to many physicians, tests, and the 1989 surgery. Despite this history, she stated that "[d]ealing with the severe pain in both feet led me to

taking Dr. Kim's advice of staying off my feet and taking time off work, which I did starting June 23, 1987." She does not complain of functional restrictions beyond the need to stay off her feet. She does note in this form that in 1985 and 1986 she had spine x-rays, and she notes that Dr. Ernest W. Stiller found evidence of a "spine disorder." However, there is nothing additional indicating that she was then disabled due to a back condition. Estok's "work activity" form dated April 5, 1993 and accompanying comments refer to "severe and constant pain" in her feet and ankles. She adds that even "while sitting or lying my feet and or legs will go numb," and that she had to "elevate my legs as much as possible" to relieve the pain. There is no indication, however, that any physician recommended elevation of her feet, especially to the extent it would interfere with sedentary work.

Given this extensive evidence that Estok could perform jobs that did not require much walking or standing, we conclude that the ALJ had substantial evidence to find that Estok was not disabled from fibromyalgia or any other condition as of December 1992. Even if the ALJ considered only Estok's foot pain prior to December 1992 (without regard to whether the foot pain was caused by tarsal tunnel or fibromyalgia), he had substantial evidence to find the pain was not disabling.

Although fibromyalgia is difficult to diagnose and without a known cure, and can produce disabling pain, and although Estok faced a labyrinthine search for a proper diagnosis and appropriate treatment, we are limited by our standard of review and the legal definition of "disability" under the Social Security Act. We hold that there is substantial evidence in the record to support the ALJ's determination that as of December 31, 1992, when her insured status expired, neither Estok's foot and ankle pain nor any other symptoms or conditions prevented her from performing sedentary work. *See, e.g., Renner v. Heckler,* 786 F.2d 1421, 1423 (9th Cir.1986). Accordingly, we AFFIRM the judgment of the district court.