10 F.3d 739
 43 Soc.Sec.Rep.Ser. 12, Unempl.Ins.Rep. CCH (P) 17654A
Linda L. SISCO, Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Louis
W. Sullivan, M.D., Secretary, Defendant-Appellee.
 No. 93-6040.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 30, 1993.
 
 Jim Merz, Oklahoma City, OK, for plaintiff-appellant.
 Joe L. Heaton, U.S. Atty., M. Kent Anderson, Asst. U.S. Atty., W.D. Okl., Donald A. Gonya, Chief Counsel, Randolph W. Gaines, Deputy Chief Counsel for Social Sec., A. George Lowe, Deputy Chief Counsel for Disability Litigation, and Charlotte M. Connery-Aujla, Atty., Office of Gen. Counsel, Social Sec. Div., Dept. of Health and Human Services, Baltimore, MD, for defendant-appellee.
 Before McKAY, Chief Judge, SETH and BARRETT, Circuit Judges.
 McKAY, Chief Judge.
 
 
 1
 The parties have agreed that this case may be submitted for decision on the briefs. See Fed.R.App.P. 34(f); 10th Cir.R. 34.1.2. The case is therefore ordered submitted without oral argument.
 
 I.
 
 2
 This is an appeal from a federal district court's ruling affirming an Administrative Law Judge's (ALJ) denial of Social Security benefits. Plaintiff is a 45-year-old mother whose health began to deteriorate in 1983 when she acquired a lymph gland infection. The infection lasted for several months. Although she suffered from symptoms suggestive of mononucleosis, her doctors were unable to diagnose the source of the infection. Despite her illness, she was able to finish her master's degree in educational counseling and psychology and in October of 1983 began work as a psychological assistant for the Oklahoma Department of Corrections. In the early months of her new job Plaintiff began experiencing extreme fatigue and severe headaches to the point where she was unable to perform her work satisfactorily. These symptoms led to the termination of her employment in January of 1984.
 
 
 3
 Plaintiff then worked in temporary jobs as a data entry operator until she enrolled at Oral Roberts University in January of 1985 for a master's degree in divinity. Soon after attempting to return to school, however, Plaintiff was forced to drop out because her physical condition had continued to deteriorate. She was suffering from severe muscle pains over her entire body, excessive fatigue, headaches, and stomach nausea. She has been unable to return to full-time employment since she left Oral Roberts in February of 1985.
 
 
 4
 During the period when her condition was worsening, Plaintiff sought medical help for her ailments. Between April of 1985 and May of 1989, she was examined by more than fifteen doctors of various specialties. None were able to diagnose a physical problem or disease that could adequately explain the severity of her symptoms. After being unable to find a physical cause, a few doctors, including one Social Security consultant, suggested personality disorders or hypochondriasis as the root of Plaintiff's problems.
 
 
 5
 In October of 1989, Plaintiff was evaluated by a team of doctors at the Mayo Clinic in Rochester, Minnesota. After performing a series of tests and reviewing Plaintiff's medical history, the reporting doctor at Mayo diagnosed tension myalgia and chronic fatigue syndrome. (Appellant's App. at 141.) Chronic fatigue syndrome is a disease that did not become widely known in the medical community until 1988 when the first diagnostic article concerning it was published. It was also in 1988 that the Centers for Disease Control in Atlanta accepted chronic fatigue syndrome as a disease. See Reed v. Secretary of Health and Human Services, 804 F.Supp. 914 (E.D.Mich.1992). It is believed to be caused by an as yet unidentifiable virus, (Appellant's App. at 150.), or a "chronic [i]mmunologically mediated inflammatory process of the central nervous system." Lawrence M. Tierney, Jr., M.D., et al., Current Medical Diagnosis and Treatment 19 (1993).
 
 
 6
 In July of 1990, Dr. Becker, Plaintiff's treating physician, reviewed plaintiff's medical history and the report from the Mayo Clinic. In response to interrogatories posed by Plaintiff's attorney, Dr. Becker stated that the Plaintiff met both the major and minor criteria for the disease as established by the National Centers for Disease Control. He also stated that the chronic fatigue syndrome rendered Plaintiff totally disabled, unable to sustain activity--or even sit upright in a chair--for more than fifteen to twenty minutes without having to lie down to resolve fatigue.
 
 
 7
 Plaintiff filed her initial application for Title II disability benefits on September 5, 1986. After denial on initial and reconsideration determinations, Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on August 7, 1987. The ALJ denied Plaintiff's claim for disability insurance benefits on April 22, 1988, and that decision was affirmed by the Appeals Council on October 13, 1988. Plaintiff filed a second application for disability insurance benefits and supplemental security income on March 18, 1989. After again being denied benefits at both the initial and reconsideration stages, Plaintiff was granted a second hearing on March 14, 1990. On August 7, 1990, the ALJ once again denied disability insurance benefits to the Plaintiff, a decision ultimately affirmed by the Appeals Council and the federal district court.
 
 
 8
 Plaintiff requests that we review the ALJ's decision of August 7, 1990, stemming from the hearing held on March 14, 1990. In addressing Plaintiff's claim, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. Sec. 404.1520(b)-(f). At the first step, the ALJ found that Plaintiff was not working or engaging in substantial gainful activity. At step two, he found that Plaintiff suffered from a severe impairment. At the third step, the ALJ found that Plaintiff's impairment did not meet or equal a listed impairment. The ALJ then decided the case against Plaintiff at the fourth step. The fourth step requires the ALJ to determine whether the severe impairment prohibits the claimant from performing her past relevant work. He found that it did not, stating that, "the evidence, here, supports a conclusion that the claimant is able to return to her past relevant work as a general office clerk, which was light work. She would also be able to work as a data entry clerk, which was sedentary and semi-skilled work." (Appellant's Supp.App. at 13.) Plaintiff contends that the ALJ's decision on the fourth step was not supported by substantial evidence.
 
 II.
 
 9
 The role of this court under 42 U.S.C. Sec. 405(g) is to determine whether there is substantial evidence in the record to support the decision of the Secretary, and not to reweigh the evidence or try the issues de novo. See Brown v. Bowen, 801 F.2d 361, 362 (10th Cir.1986). If supported by substantial evidence, the Secretary's findings are conclusive and must be affirmed. Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 1422, 28 L.Ed.2d 842 (1971). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. at 401, 91 S.Ct. at 1427.
 
 
 10
 In holding that Plaintiff was capable of working as an office clerk or data entry operator, the ALJ claimed to rely on Plaintiff's testimony as to her lifestyle and physical capabilities. He recapitulated Plaintiff's testimony in his opinion, writing, "In the morning, she would get up, get dressed, take a shower, wash her hair, have breakfast, [and] do a few household chores...." (Appellant's Supp.App. at 9-10.) However, the record reveals that, when questioned at the hearing about her routine in the morning, Plaintiff's actual response was:
 
 
 11
 [U]sually I lay there [until] I have enough energy to get out of bed and then I always, I always try to at least get up and get dressed and try to take a shower and sometimes it may take me [thirty minutes] to an hour but I, I always try to do that because then I always feel better about my day and then I go back and lay down for 30 minutes to an hour. If I wash my hair it's more like an hour [that I have to lie down] but if I don't wash my hair I can get by with about 30 minutes or so and then I try to get cereal or something for breakfast and if I'm having a bad day I might have to go right back to bed and if I'm having a good day, three or four times a month, then I can try to do maybe a household chore.
 
 
 12
 (Appellant's App. at 246) (emphasis added). Plaintiff testified that she takes showers instead of baths because when she has tried to take baths in the past she has been unable to climb out of the bathtub. (Id.)
 
 
 13
 The ALJ represented that Plaintiff routinely cleans the house, washes the dishes, and dusts her furniture without hindrance from her disability. (Appellant's Supp.App. at 9-10.) As to her ability to dust the furniture and clean the dishes, Plaintiff actually stated:
 
 
 14
 Well I get the dishes done about every--I, like I never get them all done at once except maybe every other week so usually I just do what has to be done to keep from really being dirty and I dust about every month or month and a half but I [split] the dusting over three days so I try to do what I can one day and the next three or four days if I feel good I dust another part of the house and [then] maybe the dining room and then maybe my bedroom later.
 
 
 15
 (Appellant's App. at 246-247.)
 
 
 16
 Without further elaboration, the ALJ noted that Plaintiff entertains herself during the day by watching television and reading. (Appellant's Supp.App. at 10.) Plaintiff's actual testimony was that she usually ends up watching TV on a little set in her bedroom "because I just cannot sometimes even sit up to watch TV in the living room." (Appellant's App. at 247.) As to reading books, Plaintiff testified:
 
 
 17
 I can't sit here and read but maybe a few minutes. I have to lay down to read ... and rest the book on my chest or, or read a real light book like a paperback that I won't have to hold, that's not very heavy and I can read maybe, sometimes I can read 30 minutes and sometimes I read 2 or 3 pages then I'll sleep 10 or 15 minutes then I'll read 2 or 3 more pages and, if that's what I have to do that's what I do sometimes to, to read.
 
 
 18
 (Id. at 247-248.)
 
 
 19
 The ALJ was persuaded that Plaintiff can work as an office clerk because "the only medication she takes for pain appears to be aspirin occasionally." (Appellant's Supp.App. at 13.) Although the record appears to make no mention of aspirin, Plaintiff's testimony and exhibits indicate that over the past ten years doctors have prescribed a plethora of medications and remedies in an effort to ease her discomfort, including Naprosyn, Clonidine, Carafate, Elavil, Entex, and physical therapy. Moreover, in 1986, a TENS unit was connected to her cervical and midthoracic area in an attempt to provide some relief for her severe pain. (Appellant's App. at 95.)
 
 
 20
 The ALJ was also impressed by the fact that Plaintiff can walk the length of a street block. (Appellant's Supp.App. at 10.) In her testimony, Plaintiff did indicate that she could walk a block. She went on to say that if she did, "I couldn't get back, you'd have to go get the wheelchair and come and get me." (Appellant's Supp.App. at 89.) She further testified, "I can't walk, my body starts shutting down and I'll just, I'll just sit down on the floor right where I'm at. It's very embarrassing." (Id. at 88-89.) The ALJ noted that Plaintiff visits with friends, shops, and occasionally goes to church. Plaintiff testified to being able to do these activities very infrequently and only if she's feeling well. When she attempts to complete one of these tasks, she must have the assistance of a driver and someone to push her wheelchair. (Id. at 87-88.)Plaintiff's testimony in these respects was completely unrebutted at the hearing. Her testimony was corroborated by the opinions of her treating physician and the Mayo Clinic, both of which indicated that her severe symptoms and lifestyle are consistent with their diagnoses of chronic fatigue syndrome. The ALJ's decision was not compelled by credibility determinations, and in fact, he complimented Plaintiff's general demeanor at the hearing. (Id. at 9.) The ALJ built his factual basis by taking Plaintiff's testimony out of context and selectively acknowledging parts of her statements while leaving important segments out. He offered no justification whatsoever for distorting her testimony, but presented his findings as an accurate reflection of Plaintiff's statements. We do not suggest that the ALJ acted in bad faith or is incompetent at synthesizing a factual basis from a record. Rather, his written opinion and oral statements at the hearing reveal that he was operating under several fundamental misconceptions that have haunted this case from the beginning.
 
 
 21
 The most glaring misconception is the ALJ's belief that the language in Sec. 223(d)(5)(A) of the Social Security Act (SSA) requiring proof of a disability by "medically acceptable clinical or laboratory diagnostic techniques" means that a disability is covered by the Act only if it can be conclusively diagnosed by a "laboratory-type" test. While going through the motions of applying the five-step test and evaluating Plaintiff's testimony, the ALJ returned time and time again to his erroneous belief that Plaintiff had not presented the type of medical evidence necessary to receive benefits. The ALJ revealed his philosophy at an early hearing, stating:
 
 
 22
 It's easy enough to run tests. There are many things that you can run a test on, as you know. And you know that the person has a [disease] or they do not have a [disease] simply because it's just like you put the dip stick in the gas tank. You know, when you pull it out if it's wet there you know you have gas in there. If it isn't wet, why you don't have any gas. Well, the same thing is true with some of these things.
 
 
 23
 (Appellant's Supp.App. at 65-66.)
 
 
 24
 Several times in his opinion the ALJ cited the symptoms from which the Plaintiff suffers and then discounted those symptoms by reiterating that "[t]he claimant's subjective complaints are not realistically supported by the medical evidence." (Appellant's Supp.App. at 2.) When discussing his finding that Plaintiff is capable of returning to work full-time as an office clerk or data entry operator, for example, the ALJ cited the "medically acceptable clinical or laboratory diagnostic techniques" language in the SSA and stated:
 
 
 25
 From a physical point of view, [I] simply can find no impairment that would interfere with the claimant's [ability] to function. There is a diagnosis, or impression, given by some doctors that she has, may have, or could have a chronic fatigue syndrome; however, there is no documentation of record which establishes this syndrome as required by law.... [I]t [is] up to the claimant to produce such medical and other evidence of the existence of an impairment as may be required by the Secretary. Her statements as to pain and other symptoms are not alone to be considered conclusive evidence of disability. There must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment....
 
 
 26
 The claimant, here, has been repeatedly tested and in each instance those findings have not been forthcoming.... Those physicians that have, indicated the chronic [fatigue] syndrome as an assessment, have not supported it with any kind of objective findings or laboratory testing which would support those conclusions.
 
 
 27
 (Appellant's Supp.App. at 12) (emphasis added).
 
 
 28
 Thus, the ALJ impeached Plaintiff's unrebutted testimony, discredited her treating physician's unchallenged diagnosis, and rebutted the findings of the Mayo Clinic solely because he was looking for some sort of conclusive "dipstick" laboratory test--such as a blood test--under his interpretation of Sec. 223(d)(5)(A) of the SSA. The district court adopted the same interpretation as the ALJ, noting that the diagnoses were based on "literature" rather than on "objective medical findings." Sisco v. Sullivan, No. CIV-91-1675-C, slip op. at 4. The ALJ cited no support for his assumption that "medically acceptable clinical or laboratory diagnosis techniques" can only mean conclusive laboratory tests. Indeed, the plain meaning of the language simply indicates that a claimant's disability must be diagnosed through the use of a technique, either clinical or laboratory, that has been accepted by the medical community.
 
 
 29
 At this point there is no "dipstick" laboratory test for chronic fatigue syndrome. If there were such a test, and had it been reasonably accessible, the ALJ might have been justified in drawing inferences from Plaintiff's failure to have it administered. The ALJ's and the district court's reading of Sec. 223(d)(5)(A) of the Social Security Act would mean that chronic fatigue syndrome, and other disabilities that cannot be diagnosed with a "dipstick," could never be recognized as disabilities under the Act. Yet the Social Security Administration's own internal operations manual, which lists chronic fatigue syndrome as a disease to be adjudicated on a case-by-case basis, defies this interpretation. See Program Operations Manual System, Sec. DI 24575.005; Reed, 804 F.Supp. at 918. Furthermore, since its "discovery" a few years ago, numerous cases involving chronic fatigue syndrome have been adjudicated across the country and we are unable to find any suggestion in these cases that this disease--or any other disease--is per se excluded from coverage because it cannot be conclusively diagnosed in a laboratory setting. See, e.g., Thaete v. Shalala, 826 F.Supp. 1250 (D.Colo.1993); Irey v. Sullivan, 993 F.2d 882 (9th Cir.1993); Cohen v. Secretary, 964 F.2d 524 (6th Cir.1992); and Reed v. Secretary, 804 F.Supp. 914 (E.D.Mich.1992).
 
 
 30
 Plaintiff's treating physician identified the clinical technique used by the medical community to diagnose chronic fatigue syndrome. (Appellant's App. at 143.) The first method of diagnosis of this type was set forth in 1988 in the Annals of Internal Medicine, Vol. 108, Jan.-March 1988. The "operational" diagnosis technique used by the medical community at the present time involves testing, the matching of a detailed list of symptoms, the painstaking exclusion of other possible disorders, and a thorough review of the patient's medical history. (Appellant's App. at 145-168, 170-172.) Both her treating physician and the Mayo Clinic appeared to reach their conclusions by using this type of step-by-step diagnostic procedure. Plaintiff's treating physician stated that his diagnosis was reached under the guidelines established by the National Centers for Disease Control in Atlanta. (Appellant's App. at 143.) Although this type of clinical diagnostic method may not be as dramatic or impressive to a layman as a "dipstick" laboratory test, it is the technique presently used and accepted by the medical community. Section 223(d)(5)(A) of the Social Security Act does not require more. In the ALJ's mind, chronic fatigue syndrome may not be a legitimate disease until it can be diagnosed in a laboratory setting. However, he cannot substitute his lay opinion for that of Congress, the Mayo Clinic, Plaintiff's doctor, and the entire medical community.[1] Reed, 804 F.Supp. at 919.
 
 
 31
 The second major misconception held by the ALJ and the district court was that Plaintiff's early medical history somehow rebutted or contradicted the two recent diagnoses of chronic fatigue syndrome. From 1983 through 1989, Plaintiff was examined by dozens of doctors who were unable to diagnose a physical problem sufficient to explain the severity of her symptoms. After being unable to find a physical cause, a few assessed her as a hypochondriac or as suffering from personality disorders. In his opinion, the ALJ discredited the eventual diagnoses of chronic fatigue syndrome by referring to the early examinations and stating, "The claimant, here, has been repeatedly tested and in each instance those findings have not been forthcoming. Some of the physicians who have treated the claimant have been unable at all to find anything of significance wrong with her. Some have indicated either little or no disability." (Appellant's Supp.App. at 12.) Similarly, the district court noted that her eventual diagnosis "is completely contradicted by the other medical evidence of record." Sisco v. Sullivan, No. CIV-91-1675-C, slip op. at 3.
 
 
 32
 Under the facts of this case, the early examinations cannot be considered as contradicting or rebutting her recent diagnoses. As previously mentioned, chronic fatigue syndrome was not even recognized as a disease until 1988, and the first technique to diagnose it was not published until that same year. The Mayo Clinic was finally able to provide an explanation for Plaintiff's symptoms late in 1989. It was precisely because of the Mayo Clinic's reputation for diagnosing new and rare diseases that Plaintiff's doctors referred her there. It is highly unlikely that any of the physicians who examined Plaintiff prior to the Mayo Clinic would have considered or even been aware of chronic fatigue syndrome. The government has not cited to a single physician who examined Plaintiff after the Mayo Clinic or in light of the medical community's new understanding of chronic fatigue syndrome who contradicted or in any way questioned the conclusions of the Mayo Clinic and her treating physician.
 
 
 33
 Moreover, because chronic fatigue syndrome is diagnosed partially through a process of elimination, an extended medical history of "nothing-wrong" diagnoses is not unusual for a patient who is ultimately found to be suffering from the disease. The Mayo Clinic and her treating physician considered Plaintiff's entire medical history--including all the failed attempts to diagnose--in making their assessments. Finally, in a purely linguistic sense, an early report that "I am unable to find the cause" does not contradict a later report that "I have now found the cause." These statements together demonstrate an evolution rather than a contradiction. None of the pre-Mayo physicians ruled out chronic fatigue syndrome; they merely expressed an inability to discover an adequate physical explanation for her symptoms. When viewed in the proper light, Plaintiff's medical history does not rebut her recent diagnoses. See Reed, 804 F.Supp. at 921 (holding that conclusions of specialists who examined patient before chronic fatigue syndrome became widely known could not rebut recent diagnosis of treating physician who was a generalist). Thus, Plaintiff's testimony and medical evidence stood entirely unchallenged in front of the ALJ.
 
 
 34
 For all of the above reasons, we hold that the ALJ's decision that Plaintiff is capable of performing full-time sedentary or light work was not supported by substantial evidence. Because sedentary work is the lowest classification under the statute, there is no need for further proceedings in this matter other than a remand for an award of benefits. See 42 U.S.C. Sec. 405(g) ("The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the case for a rehearing."); Thaete, 826 F.Supp. 1250 (reversing and remanding for an award of benefits after ALJ refused to properly consider the claimant's diagnosis of chronic fatigue syndrome, claiming that it was not based on "significant medical findings"); and Cohen, 964 F.2d 524 (reversing and remanding for an award of benefits after ALJ refused to give proper consideration to claimant's diagnosis of chronic fatigue syndrome).
 
 
 35
 Plaintiff's disability has been evaluated by an adjudicatory body no fewer than ten times over the past several years--eight of which have been at various levels in front of the Secretary. In the meantime, Plaintiff has lived on a meager income and tried to support a teenage son. As far as quantum of proof, Plaintiff has exceeded what a claimant can legitimately be expected to prove to collect benefits under the Act. Her case stands unchallenged. The record reveals that the ALJ has resented Plaintiff's persistence, refused to take her disease seriously, and at times treated her claim with indifference or disrespect. The Secretary is not entitled to adjudicate a case "ad infinitum until it correctly applies the proper legal standard and gathers evidence to support its conclusion." Thaete, 826 F.Supp. at 1252 (citing Sanders v. Secretary of Health and Human Services, 649 F.Supp. 71, 73 (N.D.Ala.1986)). The judgment of the district court is reversed and the case is remanded to the district court with instructions to remand to the Secretary for an immediate award of benefits.
 
 
 36
 REVERSED and REMANDED.
 
 
 
 [1]
 The district court essentially reiterated and adopted the ALJ's interpretations and findings without significant discussion. Two points raised by the district court deserve mention. First, the district court opined that the report by the Mayo Clinic "doesn't completely support plaintiff's position in this appeal." Presumably, the court was influenced by the report's language, "and wonder if there may be some psychological overlay." A review of the medical literature in the record demonstrates that a psychological overlay is consistent with a diagnosis of chronic fatigue syndrome; it often develops as a secondary reaction to the physical aspects of the disease. (Appellant's App. at 158.) Furthermore, an overlay is simply an overlay. It does not change the nature of the underlying diagnosis. The district court might also have been persuaded by the language, "I find no evidence for a metabolic myopathy, including periodic paralysis." As previously discussed, chronic fatigue syndrome is diagnosed partially by excluding other possibilities. Thus, the doctor's exclusion of other illnesses cannot be seen as inconsistent with his final diagnosis of tension myalgia and chronic fatigue syndrome
 Second, the district court attempted to discredit the findings of Plaintiff's treating physician by noting, "It is not apparent from his report that he had even examined plaintiff." Sisco v. Sullivan, No. CIV-91-1675-C, slip op. at 4. After carefully scrutinizing Dr. Becker's report, we have been unable to determine how the district court arrived at this conclusion. Indeed, Dr. Becker's report makes clear that he not only spent a significant amount of time researching and studying chronic fatigue syndrome, but that he thoroughly examined and treated Plaintiff for four months prior to making his report. Dr. Becker stated that he was Plaintiff's treating physician, and had been treating her since April of 1990. (Appellant's Second Supp.App. at 1.) Dr. Becker then described Plaintiff's symptoms and physical problems in great detail. We note that Dr. Becker used the word "evaluation" synonymously with "examination." However, we have never held that a treating physician must use specific, technical language before we will consider his findings. Dr. Becker's report is clear on its face and is sufficient.