**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 1 1999**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

JUDY A. ARRINGTON,

      Plaintiff-Appellant,

v.

KENNETH S. APFEL, Commissioner,
Social Security Administration,

      Defendant-Appellee.

No. 98-7099
(D.C. No. 97-CV-256-B)
(E.D. Okla.)

---

ORDER AND JUDGMENT  *

---

Before **BALDOCK** , **BARRETT** , and **HENRY** , Circuit Judges.

      After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.

---

\*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff Judy A. Arrington appeals an order of the district court affirming the Commissioner's determination she is not entitled to social security disability benefits. Plaintiff alleges disability due to back and neck problems which arose following an on-the-job injury, specifically a fall she took while refueling her truck. We have jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291.

The administrative law judge (ALJ) followed the appropriate sequential analysis. See generally Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing five steps). He denied disability benefits at step five of the analysis after determining plaintiff retained the residual functional capacity (RFC) to perform a full range of light work, reduced by her inability to perform work that requires reaching above chest level or more than occasional bending or stooping.

On appeal, plaintiff raises the following issues: (1) the Commissioner failed to identify specific jobs plaintiff could perform at step five of the sequential analysis; (2) the vocational evidence is incompetent and therefore cannot serve as substantial evidence to support the Commissioner's decision; (3) the ALJ improperly evaluated the medical evidence; and (4) plaintiff's medical impairment meets or equals the listing for disability, and she should have been found to be disabled at step three of the evaluation sequence.

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in light of the entire record and whether the correct legal standards were applied. See Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1028 (10th Cir. 1994). We neither reweigh the evidence, nor do we substitute our judgment for that of the agency. See Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991).

We address the step-three claim first. Plaintiff claims she has an impairment meeting listing § 1.05(C) of 20 C.F.R. Pt. 404, Subpt. P, App 1. This listing requires a showing of a vertebrogenic disorder

> (e.g. herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:
>
> 1. Pain, muscle spasm, and significant limitation of motion in the spine; and
>
> 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

To show that an impairment matches a listing, the impairment "must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). In addition, "[a]ppropriate abnormal physical findings must be shown to persist on repeated examinations despite therapy for a

reasonable presumption to be made that severe impairment will last for a continuous period of 12 months." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.00(B). It is plaintiff's burden to show she meets these criteria. See Nielson v. Sullivan, 992 F.2d 1118, 1120 (10th Cir. 1993) (holding that claimant bears burden of proof through step four of analysis).

Plaintiff complains that "the ALJ made only a summary conclusion" that she was not disabled and failed to discuss the evidence and explain why he found she was not disabled at step three as required by Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996). Appellant's Br. at 38. We disagree. The ALJ's discussion of the medical evidence was adequate to support his conclusion that she failed to meet her burden of proving that her impairments satisfied listing § 1.05(C). See id. at 29-30.

Magnetic Resonance Imaging (MRI) of the lumbar and cervical spine performed in May and June of 1994 indicated right paracentral herniated nucleus puplosus and mild disk bulges. Right-sided disk herniation was also noted. Appellant's App. at 141-49. The studies did not "demonstrate evidence of overt spinal cord compression or clear cut nerve root encroachment at either the cervical or lumbar level." Id. at 152. Her July 1994 brief hospitalization with severe back pain resulted in discharge, in stable condition, with a recommendation of no lifting greater than fifteen pounds. Id. at 169. Further,

-4-

the lumbar MRI performed in conjunction with this hospitalization showed that the small right-sided disc herniation at the T12-L1 level appeared less prominent and was causing less thecal sac impression than those resulting from the May examination. See id. at 178.

Subsequent discographs of the cervical, thoracic, and lumbar spine in December of 1994 showed some degeneration and leakage in the cervical spine which produced shoulder and neck pain. However, the origin of her low back pain radiating down the right leg was found to be indeterminate because the symptoms (i.e., pain) could not be produced from stimulation of the disks. The thoracic disks were also painless. See id. at 189-96.

Certainly plaintiff suffers from some of the criteria for a listing contained in § 105(C). However, notwithstanding medical findings of decreased range of motion of the spine, see Appellant's App. at 202, 204-08, the record does not show that this amounts to a significant limitation of motion of the spine. Nor is there evidence of "appropriate radicular distribution of significant motor loss." § 105(c)(2). There has been no diagnosis of radiculopathy (disease of the nerve roots), as such, with only intermittent mentioning of radiculitis (inflammation of a nerve root) and one suggestion of "possible underlying C6 nerve root impairment." Id. at 203. We therefore conclude that substantial evidence supports the ALJ's determination at step three.

The balance of the errors relate to the ALJ's determination at step five that plaintiff retains the residual functional capacity (RFC) to perform a substantial number of jobs and that she is therefore not disabled. We have carefully reviewed the record and conclude there is not substantial evidence to support this part of the ALJ's decision.

Plaintiff is a forty-four year old woman whose primary occupations have included truck driver, beautician, real estate agent, and apartment manager. She has a GED and has been to cosmetology school, real estate school, and truck driving school. Neither of her occupational licenses (for cosmetology and as a real estate agent, both from Nevada) is current. She also obtained a commercial truck driver's license. Her alleged disability onset stems from a fall she took while fueling her truck in April of 1994. Since then she has suffered from increasingly worsening problems of the cervical, thoracic and lumbar spine.

In October of 1994, when she was examined by Dr. Pentecost, an orthopedic surgeon, she complained of occasional headaches, back and hip pain. She also complained of headaches at the base of her neck radiating across her right shoulder. From there the pain radiated down the spine and across the low back. She also reported that coughing hurt her back. Dr. Pentecost noted that she used her hands to support her low back. He gave her a cortisone shot and prescribed Oruvail, Skelaxin, and Esgic Plus. He diagnosed cervical and lumbar

disk syndrome and noted she might need a cervical discogram and possibly neck surgery. See id. at 181-83.

She returned to see Dr. Pentecost in mid-December. She completed a form before seeing him on which she noted that her lower back hurt more and that she had pain in her neck, back, hip, and right foot. She also stated that the pain was aggravated by sitting, standing, walking, lying down, and riding in a car. See id. at 188.

In April of 1995, plaintiff was examined by Dr. Ellis, apparently in conjunction with a state worker's compensation claim. Dr. Ellis issued a permanent partial disability report based on his examination of plaintiff and his review of the earlier reports and office notes of Drs. Standefer, Hodge, Eckman, and Pentecost. Dr. Ellis noted that she still had headaches, pain in her right shoulder with tingling all down her right arm to the hand, and pain in her lower back and buttocks. She had decreased grip strength (about half what he would have expected), decreased motion in the cervical, thoracic and lumbar spine and decreased sensation in her right hand, foot and thigh, particularly with the application of gentle pressure. Dr. Ellis recommended an active walking program and stated that plaintiff may need neck or back surgery in the future. He stated that she was temporarily totally disabled, with a 22% total permanent partial impairment of the body because of her neck and a 20% total permanent partial

impairment because of her back. He also stated she should not lift over forty pounds and could not do work which required her to keep her hands above her chest, or engage in prolonged standing or bending. See id. at 200-04.

At the outset of her hearing before the ALJ, plaintiff was asked for a list of her medications in case he had any questions about them. [1] See id. at 45. Also at this time Dr. Ellis's report was first introduced into the record. Id. Plaintiff testified that her activities are very limited, see id. 75-77, and that she is in constant pain from headaches and back discomfort. See id. at 56-57; 59-60; 64-65. She sometimes needs help dressing and showering. See id. at 72-73. She uses a trapeze bar above her bed in order to get up and on occasion she would need to awaken her husband to help her get up. See id. at 74. She cannot sit or stand for very long (ten to fifteen minutes) without changing positions. See id. at 67. She has numbness in her right hip and foot and pain in her toes. See id. at 60. When she goes out, she uses a cane, prescribed by her family doctor a few months after the accident, because she has come close to falling (and has fallen) due to the numbness and pain in her right foot. See id. at 62-64. She stated that she had driven twice during the year following her accident. See id. at 69. In addition, she testified to a numbness in her right hand, particularly her index and

---

[1] The medication list was not submitted until the close of the hearing, and the ALJ did not ask any questions based on her medications, which are particularly relevant with respect to plaintiff's claim of disabling pain.

ring fingers, that causes her to drop things. Peeling a single potato would cause her hand to become numb. See id. at 57-59.

Plaintiff described muscle spasms in her back, which she said she had at least three times a month, sometimes requiring up to two days bed rest before they subside. [2] See id. at 61-62. She claimed to have daily headaches for which she used aspirin and pain pills. See id. at 64-65. She stated she could not sit for long because of her back and hip pain. Apparently, she stood up at one point during her testimony. See id. at 66. She also related that she could only stand ten to fifteen minutes. See id. at 67. She lies down half an hour to an hour twice a day to ease her back and leg pain. See id. at 68. She described her medications, stating that the pain pills caused drowsiness, while the muscle relaxants caused a "who cares effect." See id. at 70-71.

Following plaintiff's testimony, the ALJ asked the vocational expert (VE) to describe plaintiff's work history in terms of her skills and exertional levels. The VE described her relevant experience as ranging from light to medium in exertional levels and low semiskilled through skilled in terms of

---

[2] She testified that the first of these episodes resulted in her three-day hospital stay in July of 1994.

skill levels. [3]  See id. at 79-80.  The ALJ then posited a series of hypothetical questions to the VE using selected exhibits from plaintiff's medical records.

The ALJ first assumed plaintiff to have a ninth grade education, a GED, and vocational training for cosmetology, a real estate license, and "truck driver school."  He assumed a good ability to read, write and use numbers.  The ALJ assumed plaintiff could perform light or sedentary work with a lifting restriction of thirty-five to forty-five pounds, "the back problem," and only occasional bending and stooping. [4]  See id. at 80-81.

In response, the VE stated plaintiff could perform the occupations of toll booth attendant (light, entry level), self-serve gas station attendant (light, entry level), hotel clerk (light, semiskilled), bank teller (light, semiskilled), grading clerk (sedentary, semiskilled), receptionist (sedentary, semiskilled), and telemarketer (sedentary, semiskilled).  See id. at 81-82.  The VE did not state the source for his descriptions of either the exertional or skill levels of these jobs.

---

[3]   There was one period of time when plaintiff worked for the Tastybird Food Company cutting up chickens, which the VE described as entry level work.  In his decision, the ALJ listed only the occupations as truck driver, beautician, real estate agent, and apartment manager as being relevant.  See id. at 33.

[4]   This particular medical evidence consisted of Dr. Standefer's reports of April, May and June of 1994, in which he prescribed conservative treatment, i.e., nonnarcotic anti-inflammatory medication, physical therapy and caution with lifting and bending.  See id. at 150-57.  These reports, of course, predated plaintiff's hospitalization and discographs.

The ALJ then asked for any unskilled, sedentary jobs, to which the VE added "entry level bookkeeping" and "miscellaneous hand labor jobs." See id. at 82.

The second hypothetical assumed additional restrictions of a right hand "numb a lot of the time," the fact the person drops things and has trouble writing more than a few minutes. The ALJ also included a need to alternate sitting and standing. See id. The VE responded that the inability to write for more than a few minutes basically eliminated most jobs. See id. at 83.

With the third hypothetical, the ALJ asked the VE to assume plaintiff's testimony was fully creditable. The VE replied there were no jobs in either the regional or national economies that the person could perform. The VE also noted from his personal observation that plaintiff was "continually switch[ing] hands to prop herself up to apparently relieve the pain [and] get into the best positions." Id. at 83. When combined with the headaches, low back pain, numbness, and need to lie down twice daily, and the need to have her husband "help her with activities of daily living," the VE concluded that she could not work an eight-hour day. Id. at 83-84.

The ALJ then began over again with a fourth hypothetical, and a "fresh clean slate" with different limitations. See id. at 85. The basis for this last question was the report completed by Dr. Ellis in conjunction with the worker's

compensation claim. [5] See id. at 200-09. Using this report (and assuming the same age, education and work background as before), the ALJ described new restrictions as follows: The ALJ assumed plaintiff is able to walk two miles in twenty minutes. [6] The ALJ also added numbness in the right index finger along with neck, shoulder, and right arm pain, and no prolonged standing or bending. He included a lifting restriction of a maximum of forty pounds, along with a limitation on not raising her hands above her chest. See id. at 85-86.

The VE asked for clarification about the pain and the numbness. The ALJ specified moderate pain and the ability to hold things with "the other fingers but not the index finger." Id. at 86. The VE then eliminated the positions of hotel clerk, but retained the remainder. See id. As noted, the record was reopened about two months later for the inclusion of Dr. Pentecost's RFC form. See id. at 87-88. [7]

---

[5] Because this report was admitted at the start of the hearing, on this record we cannot tell if the VE ever read the report in its entirety.

[6] The VE questioned this as sounding "pretty fast." We believe that the intent of the walking program Dr. Ellis prescribed for plaintiff was that she work up to being able to walk two twenty-minute miles, or a total of forty minutes of walking. Since he had made the recommendation only a few weeks earlier, there is no indication that plaintiff had been able to achieve this goal, particularly in light of her testimony that she could walk half a block at one time. See id. at 68.

[7] There was some discussion to the effect that an EMG of the right hand and foot might be needed depending on the RFC form. See id. at 87. These tests were apparently not performed.

In his written decision, the ALJ stated, for the first time, that plaintiff had no transferrable skills. Specifically, he stated that plaintiff "does not have any acquired work skills which are transferrable to the skilled or semiskilled work functions of other work." Id. at 34. He nonetheless adopted the entire list of occupations the VE, in answer to the first hypothetical question, had initially stated plaintiff could perform. See id. at 35. Most of these positions are at least low semiskilled, by the VE's testimony. Had the ALJ told the VE to assume plaintiff had no transferrable skills, given her other limitations, the VE's testimony might have been quite different.

In addition, the ALJ considered some of plaintiff's testimony out of context and omitted important segments. See Sisco v. U.S. Dept. of Health and Human Services , 10 F.3d 739, 743 (10th Cir. 1993). For example, in describing plaintiff's activities, he stated that she testified that she "drives 7 miles to Wal-Mart twice a week." See id. at 31. Her testimony was that she had driven twice in the *entire year* following her accident. See id. at 69. She also testified that her family doctor had advised her not to drive. See id. at 70. She stated on her Reconsideration Disability Report that six months after the accident she still could not drive, see id. at 134, and she reported to Dr. Pentecost in October of 1994 that she had not driven since the accident. See id. at 182.

The ALJ also stated that plaintiff had testified "that she has a trapeze bar over her bed to lift herself out of bed in the morning, and apparently has no trouble using this."   See id. at 32.  To the contrary, plaintiff testified that sometimes she is unable to use the bar and must awaken her husband at 3:00 a.m. to help her get out of bed.   See id. at 74.  There is simply no evidence that she uses the bar without any difficulty.  Nor was there any testimony how she uses it, i.e., whether she grips it with her right or left hand, or both.

The ALJ also recited in his decision that plaintiff stated she used her quad cane "only when she went out,"   see id. at 32, neglecting to mention that she did not use it in the house "because there's furniture and the walls" on which she relied.  See id. at 64.  The ALJ also noted that she was able to pick up and hold the cane with no apparent problems, while ignoring the fact, clearly obvious to the VE, that while seated she continually propped herself up and changed hands to support herself.   See id. at 83.  Plaintiff apparently also accepted her attorney's suggestion that she could stand up for a few minutes during her testimony.   See id. at 66.

The ALJ also noted that despite plaintiff's claim of daily headaches, she had not complained to her treating physicians of this.   See id. at 32. Dr. Pentecost's notes reflect she did complain of headaches.   See id. at 182. Dr. Ellis (an examining physician) noted that she   *still*  had headaches.   See id.

-14-

at 201.  Also, of the medications plaintiff takes on a daily basis, Esgic Plus is specifically prescribed for relief of the symptom(s) of tension (or muscle contraction) headaches.    See Physician's Desk Reference at 1012 (51st ed. 1997). She listed this as a medication she takes every four hours.  She also takes, on a regular basis, Oruvail, a nonsteroidal anti-inflammatory, and Skelaxin, which is prescribed for relief from discomfort associated with "acute, painful musculoskeletal conditions."    Id. at 793.

The ALJ made no mention of her prescription drugs.  Apparently, he also discounted her claim of daily headaches because of her testimony, as he stated, that "she takes no aspring [sic] for her headaches, and an occasional pain pill if they are 'really bad.'"    See Appellant's App. at 32.  In fact, plaintiff testified she *does* take aspirin in addition to her regular dosages of pain medication.    See id. at 65.  Unfortunately, the cumulative effect of this selective acknowledgment of parts of her testimony, while "leaving important segments out," has resulted in a less than accurate reflection of her testimony.    See Sisco, 10 F.3d at 743.

The ALJ relied on plaintiff's July 14, 1994 benefits application,    see Appellant's App. at 127, as evidence that she "performed all household chores except for vacuuming and mopping"    (although he acknowledged it took her all day because she had to stop and rest).    Id. at 32.  However, her testimony at the

-15-

hearing, some ten months later (and after her hospitalization [8] and subsequent discographs) was that she was able to cook only occasionally and did not really clean house but only was able to do a little "piddling kind of stuff." See id. at 71-72. The ALJ failed to account for statements made in her October 1994 Reconsideration Disability Report that she was not able to do her normal household chores and that she was by then having more pain in her neck, back and foot. See id. at 132. She made similar representations in her written request for a hearing filed in January of 1995. See id. at 138. In evaluating plaintiff's testimony and comparing it with "prior statements and other evidence," see id. at 31-32, the ALJ was selectively choosing from the record those statements he wished to rely on without properly considering all the evidence.

In his recitation of the medical evidence, the ALJ mentioned plaintiff's treatment by Dr. Standefer, her hospitalization in July of 1994, a visit to Dr. Pentecost in October, her discographs in December, her examination by Dr. Ellis in April of 1995, and the RFC form submitted by Dr. Pentecost in May of 1995. See id. at 29-30. However, it is unclear from this listing what evidence he relied on and what, if any, he may have rejected, and why.

---

[8] The record reflects that she arrived at the emergency room by ambulance. The admitting physician noted that she had had progressive low back pain over the previous few days to such an extent she was unable to walk. See id. at 172-73.

-16-

We are also unable to discern the basis for the ALJ's discrediting of plaintiff's subjective complaints of pain. In Luna v. Bowen, 834 F.2d 161, 163 (10th Cir. 1987), we held that once a plaintiff demonstrates, by objective medical evidence, a pain producing impairment which could reasonably be expected to produce the alleged pain, if the nexus between the impairment and the pain alleged is sufficient, the decisionmaker must then consider all the evidence in determining whether plaintiff's pain is in fact disabling. Here, as in Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995), although the ALJ stated he was applying the framework for analyzing pain set forth in Luna, we are left to speculate what specific evidence led him to find plaintiff's pain was not disabling. Although the ALJ acknowledged that plaintiff has some pain, he did not adequately address all the factors described in Thompson v. Sullivan, 987 F.2d 1482, 1489 (10th Cir. 1993):

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

(quoting Hargis v. Sullivan, 945 F.2d 1482, 1489 (10th Cir. 1991) (further quotations omitted). Moreover, the ALJ did not consider plaintiff's medications, nor did he consider that her daily activities were considerably more restricted by

-17-

the time of the hearing than when she filed her disability report in July of 1994. No doctor has suggested that her pain is not genuine. See Kepler, 68 F.3d at 391. When added to the ALJ's inaccurate statements about both the evidence and plaintiff's testimony, we cannot hold that his decision regarding her pain was based on substantial evidence. On remand, the ALJ must properly consider plaintiff's claim of disabling pain based on all the evidence.

Finally, the hypothetical questions posed to the VE were problematic. The first question, based on Dr. Standefer's findings and plaintiff's condition as of shortly after plaintiff's accident, elicited a series of jobs the VE thought plaintiff could perform, most of which were at least semiskilled. With the additional restrictions of numbness in her dominant hand, however, the VE in his answers to the second and third questions stated there were no jobs she could perform. We have held that an ALJ may not ask a VE a hypothetical question based on substantial evidence and then ignore unfavorable answers. See Campbell v. Bowen, 822 F.2d 1518, 1523 n.6 (10th Cir. 1987).

Moreover, in constructing the fourth hypothetical question based on Dr. Ellis's report, the ALJ not only ignored a number of the doctor's observations and findings, e.g., that plaintiff "groans as she moves," that her grip strength was half what he would have expected, that the decreased sensation in her right hand was made "much worse" with gentle pressure on the right trapezius muscle, but

also changed the doctor's reported findings of "decreased sensation of the right thumb, index finger and ring finger with less decreased sensation of the middle finger," see Appellant's App. at 202, to "[l]et's say she can hold on to things with the other fingers but not the index finger," [9] id. at 86. We have repeatedly held that an ALJ may not engage in a selective evidentiary review. See Sisco, 10 F.3d at 743; Teter v. Heckler, 775 F.2d 1104, 1106 (10th Cir. 1985) (finding error in ALJ's rejection of certain reports as based on inadequate findings when they were comparable to reports found sufficiently detailed); Sherman v. Apfel, No. 97-7085, 1998 WL 163355, at **5 (10th Cir. Apr. 8, 1998) (unpublished order and judgment) (finding error in mentioning only parts of testimony while leaving out other important parts); see also Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir. 1984) (Secretary's attempt to use only portions of report favorable to her position, while ignoring other parts, is improper.).

If the ALJ again uses the testimony of a VE, he should construct his hypothetical questions to reflect all plaintiff's impairments. He should also

---

[9] The change, from the ALJ's assumption, in his second hypothetical question, of numbness in the right index finger, see id. at 82, was apparently prompted by the VE's concern that she might not be able to hold on to things without dropping them. See id. at 86.

determine at the outset whether she has transferrable skills in order to enable the VE to properly identify those jobs within both her skill and exertional levels. [10]

Accordingly, the judgment of the United States District Court for the Eastern District of Oklahoma is reversed, and the matter is remanded with directions to remand to the Commissioner for further proceedings.

Entered for the Court


Bobby R. Baldock
Circuit Judge

---

[10] We need not address plaintiff's claim that the definitions in the Dictionary of Occupational Titles (DOT) control when there is a conflict with the VE's testimony. See Campbell, 822 F.2d at 1523 n.3. Here, the VE did not specify the source for his assignment of skill levels to the jobs he described.