**Kathleen LOGAN, Plaintiff–Appellant,**

v.

**Jo Anne B. BARNHART,**
**Defendant–Appellee.**

**No. 03–1798.**

United States Court of Appeals,
Seventh Circuit.

Argued Aug. 6, 2003.

Decided Aug. 14, 2003.

Before BAUER, POSNER, and KANNE, Circuit Judges.

### ORDER

Kathleen Logan filed an application for disability benefits, alleging that a spastic gait and a history of ovarian cancer prevented her from working. Her application was denied initially and on reconsideration. Logan then requested a hearing before an Administrative Law Judge ("ALJ"), who found her ineligible for benefits because her insured status expired before her impairments became disabling. The district court upheld the ALJ's decision. Logan appeals, and we affirm.

The primary dispute between the parties is whether Logan was insured when her impairments developed. Logan alleged an onset date of January 30, 1997, but the ALJ concluded that she began suffering severe impairments no earlier than July 1997. The parties do not dispute that Logan's insured status expired on June 30, 1997. Thus Logan is entitled to benefits only if she can demonstrate that she became disabled before June 30, 1997. *Estok v. Apfel,* 152 F.3d 636, 638 (7th Cir. 1998); *Stevenson v. Chater,* 105 F.3d 1151, 1154 (7th Cir.1997).

At the time her insured status expired, Logan was fifty-four years old and–at 5 foot 8 inches tall and 240 pounds– obese. She had performed sedentary work as a customer service representative for an insurance agency from 1982 to 1991. Her most recent employment as a greeting card stocker kept her on her feet for much of the work day. Logan held that position from May 1994 until February 1995, when the greeting card company went bankrupt. Logan has not worked since the company dissolved.

Logan claims that she cannot work because of discomfort in her left leg. As a result of a spastic gait, she limps and has difficulty using stairs and stepping over objects in her path. She testified before the ALJ that she cannot pick up anything heavier than a gallon of milk, that she can "maybe" walk a block, and that her legs "go to sleep" when she sits for more than an hour at a time.

Although Logan's application for benefits specified a disability onset date of January 1997, she testified before the ALJ that she was not certain that her problems with her left leg began before her insured status expired on June 30, 1997. She recalls an incident in late 1996 or early 1997 when–as a passenger in a car that came to an abrupt halt–she "jamm[ed]" her foot to the floor; she believes her limp began shortly thereafter.

According to Logan, her symptoms worsened progressively, but she resisted seeking medical treatment for many months because she had no health insurance. Logan had visited her family physician, Dr. Jeffrey Mozwecz, in 1994 for treatment of chest spasms and in December 1997 for treatment of a urinary tract infection. But Dr. Mozwecz's notes from these visits make no mention of Logan's leg. Logan did not seek medical advice about her leg until January 1998, several months after the expiration of her insured status.

According to the notes of Dr. A.J. Largosa, a staff physician at a public health clinic, Logan stated that she began experiencing "discomfort" in her left leg in July 1997. A series of knee x-rays showed "mild arthritic change" and a suggestion of

early chondromalacia,[1] but "[t]he bony structures [were] intact," and the radiological findings were otherwise normal. Dr. Largosa referred Logan to Dr. Daniel Girzadas, an orthopedic specialist. Dr. Girzadas doubted that Logan was suffering from an orthopedic disease; because he suspected that the weakness in Logan's left leg could be the result of a neurological disorder such as Parkinson's disease or multiple sclerosis, Dr. Girzadas referred Logan to Dr. Melvin Wichter, a neurologist.

Dr. Wichter observed that, although Logan reported no pain in her left leg, she walked with a "mild spastic gait," her reflexes were slightly brisker on the left side, and her left toe was "decidedly upgoing." Dr. Wichter recommended further medical workup, including an MRI of the brain and the upper spinal cord, to pinpoint the cause of Logan's symptoms.

In April 1999, before Logan had the recommended MRI, she was diagnosed with ovarian cancer and underwent a hysterectomy. Following the surgery, Logan received a six-month course of chemotherapy. After she recovered from her operation, she continued to experience weakness in her leg and a spastic gait. In August 1999, Logan finally underwent the MRI, which showed "mild diffuse cerebral and cerebellar atrophy", but no evidence of multiple sclerosis, vascular disease, or metastasis of the cancer to the brain. Based on the results of the MRI and the fact that Logan had been diagnosed with ovarian cancer, Dr. Wichter opined that Logan's spastic gait could be the result of a paraneoplastic syndrome[2] related to the cancer. Logan's oncologist, however, doubted

that the spastic gait was related to the cancer, and none of Logan's doctors has conclusively pinpointed the cause of her leg problems.

Logan filed her application for disability benefits in June 1999, alleging an onset date of January 1997. When her application was denied, Logan requested and received a hearing before an ALJ. After considering the evidence, the ALJ determined that Logan suffered from a neurological disorder manifested by her spastic gait and that she had a history of ovarian cancer. But although the ALJ found these impairments to be severe, he concluded that they were not severe enough to meet or equal any impairment listed as disabling in Appendix I, Subpart P of the Social Security regulations.

The ALJ noted that, although Logan identified January 30, 1997 as her onset date, she did not consult a doctor about her leg until January 1998 and conceded in her own testimony that her spastic gait possibly did not manifest itself until after June 30, 1997. Based on Logan's testimony and the medical evidence, the ALJ found that Logan's allegations about disabling limitations prior to July 1997 were not credible. He further determined that, prior to the expiration of her insured status, Logan retained the residual functional capacity to perform her past work as an insurance agent which involved only sedentary job tasks. Accordingly, the ALJ denied Logan's request for benefits.

We will not overturn an ALJ's denial of benefits as long as the decision is supported by substantial evidence. *Johansen v. Barnhart,* 314 F.3d 283, 287 (7th Cir. 2002). "Substantial evidence" is evidence

---

**1.** Softening of the cartilage. STEDMAN'S MEDICAL DICTIONARY 341 (27th ed.2000).

**2.** A collection of symptoms associated with a malignant tumor but not directly related to invasion by the primary tumor or its metastases. STEDMAN'S MEDICAL DICTIONARY 1313 (27th ed.2000).

sufficient to convince a reasonable person that the ALJ's findings are adequate. *Id.* An ALJ need not address every single piece of evidence in the record, but his analysis must build an accurate and logical bridge between the evidence and his findings. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir.2001).

■ On appeal Logan argues that the ALJ ignored substantial evidence in the record supporting a conclusion that she was disabled prior to the expiration of her insured status. According to Logan, the ALJ concentrated solely on her spastic gait and ignored evidence of additional impairments, including obesity, brain atrophy, limited range of motion in the right arm, and chest spasms. But Logan did not list any of these impairments as a cause of her disability in her application for benefits, and she did not mention them during her testimony before the ALJ. When the ALJ asked Logan what health problems precluded her from working, she discussed only her spastic gait and the depression that she was experiencing in response to her limited mobility and her ovarian cancer. She responded "no" when the ALJ asked her if there was "anything important ... that hasn't been mentioned". Because Logan is raising these issues for the first time on appeal, she has probably forfeited them. *See Kepple v. Massanari,* 268 F.3d 513, 516–17 (7th Cir. 2001).

The Supreme Court held in *Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000), that for purposes of judicial review, a claimant does not waive an issue by failing to raise it before the Social Security Appeals Council, but did not resolve whether a claimant waives an issue by failing to raise it before the ALJ. *Kepple,* 268 F.3d at 516. In *Kepple,* this court noted that the First Circuit has concluded that a claimant waives an issue if

she does not raise it during an administrative hearing, *id.* at 517 (citing *Mills v. Apfel,* 244 F.3d 1, 8 (1st Cir.2001)), but decided the case on other grounds and left the question open, *id.* Other courts that have confronted this issue have not reached a consensus about the First Circuit's position that an issue is waived when a claimant fails to present it to an ALJ. *Compare Bechtold v. Massanari,* 152 F.Supp.2d 1340, 1347 (M.D.Fla.2001) (issue deemed waived when not raised in administrative hearing) *with Kokal v. Massanari,* 163 F.Supp.2d 1122, 1129 (N.D.Cal. 2001) (claimant who was not represented by counsel at administrative hearing did not waive issue by failing to raise it before ALJ).

In any event, we do not need to reach this issue in order to resolve Logan's appeal. The record contains no evidence that Logan suffered disabling limitations as a result of any of the conditions that she raises now but which she failed to raise before the ALJ. Although she is chronically obese, her obesity apparently did not limit her ability to work as an insurance agent or a greeting card product representative. It is true that Dr. Mozwecz treated Logan for chest spasms in 1994, but nothing in the record suggests that she has experienced chest spasms at any time since. Dr. Mozwecz's treatment notes from 1994 do mention that Logan broke her right arm in 1979 and, as a result, had a "somewhat limited range of motion" in the arm. But this is the only reference in the record to any problem Logan had with her right arm. Finally, the mild brain atrophy appears only once in the record in a summary of the findings from the MRI taken of Logan's brain. Logan's neurologist was apparently unconcerned by the finding of mild brain atrophy because he interpreted the MRI as ruling out a degenerative neurological disorder and conclud-

ed that her spastic gait might be caused by her cancer. Nothing in the record alludes to the brain atrophy as a source of symptoms or limitations, and the significance of that condition has never been explained.

█ Logan also argues that the ALJ failed to articulate a sufficient rationale for disbelieving her allegation that she was disabled as of January 30, 1997. *See Zurawski*, 245 F.3d at 888. We will defer to an ALJ's credibility determinations unless they are "patently wrong," *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000), but, under Social Security Ruling 96–7p, the ALJ must provide specific reasons for disregarding a claimant's allegations, *Zurawski*, 245 F.3d at 888. Here the ALJ did provide specific reasons for rejecting Logan's allegation of an onset date of January 30, 1997–a lack of objective medical findings and the fact that Logan did not consult a doctor about her leg until months after her insured status had expired.

Further, it was Logan's burden to substantiate when she became disabled, *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir.1994), and she presented no evidence to support her allegation of an onset date of January 30, 1997. Indeed, her submitted evidence points toward a finding that her impairments did not develop until after her insured status expired on June 30, 1997: she did not consult a doctor about her leg until January 1998, and she never mentioned a problem with her gait to Dr. Mozwecz when she sought treatment in 1994 for chest spasms or in December 1997 for a urinary tract infection. When she finally sought medical attention for her leg, she told Dr. Largosa that her spastic gait did not begin until July 1997.

According to Logan, however, the ALJ inexplicably ignored key portions of her testimony that supported an onset date of January 30, 1997. But Logan does not specify how any of her testimony sup-

ported an earlier onset date. Indeed, her testimony concerning her onset date was vague and qualified. Although the ALJ and her own attorney gave her ample opportunity to do so, Logan would not state unequivocally that she injured her leg or began suffering impairments before the end of June 1997. When the ALJ directly asked Logan if she was alleging disability since January 30, 1997, Logan responded, "Well, not really." The ALJ pressed for clarification, telling Logan, "I want to make sure it is January 30, 1997, the date you believe you first became prevented from working by your impairments." Logan responded, "I couldn't say for sure the date, but it was sometime prior to that." But when Logan's attorney asked her whether her limp started before June 30, 1997, the date her insured status expired, Logan said, "I couldn't say that. I would say it started in June sometime, but whether it was June 30th or June 15th I couldn't say."

Despite the deference owed to an ALJ's credibility determinations, Logan submits that Social Security Ruling 83–20 required the ALJ to accept her allegation of a January 1997 onset date. SSR 83–20 directs an ALJ to use the date alleged by the claimant when determining the date of onset of a disability of nontraumatic origin as long as "it is consistent with all the evidence available." As the district court observed, "The record includes no evidence–not even an intimation–that any of these conditions is disabling, or limited plaintiff's ability to work to *any* extent prior to the expiration of her insured status."

Accordingly, we AFFIRM the judgment of the district court upholding the ALJ's decision to deny Logan's application for benefits.